577 A.2d 564

**COMMONWEALTH of Pennsylvania**

v.

**Angelo P. HAYNES, Appellant.**

Superior Court of Pennsylvania.

Submitted March 21, 1990.

Filed June 14, 1990.

328

David DeFazio, Pittsburgh, for appellant.

Claire Capristo, and Maria V. Copetas, Asst. Dist. Attys., Pittsburgh, for the Com., appellee.

Before CAVANAUGH, DEL SOLE and HUDOCK, JJ.

DEL SOLE, Judge:

Angelo P. Haynes was found guilty of First Degree Murder following a jury trial, and a sentence of life imprisonment was imposed. The victim was a 53 year old woman, Eddilee Sims, whose death resulted from stabbing and strangulation. She was the mother of Mr. Haynes' friend. On appeal, Mr. Haynes raises eleven issues for our review, we will discuss each seriatim. The first three issues concern trial counsel's effectiveness. New counsel was appointed for this appeal.

Initially, Appellant claims trial counsel, Kim W. Riester, Esq., was ineffective for failing to inform him that it was not possible to determine the age of a blood smear found on the victim's sheet which matched his own blood type. This failure, Appellant alleges, prejudiced him because he was not then able to offer exculpatory testimony concerning the only evidence which placed him in the decedent's bedroom. Mr. Haynes claims that had he known this

fact, he would have testified that on a prior visit to the decedent's apartment, he wiped his hand on a sheet hanging on the bathroom door, and that he often suffered minor cuts on his hands arising from his job as a construction worker.

We find no merit in this claim. Trial counsel testified at the hearing on post-trial motions that he had discussed the origin and age of the blood stain with Appellant. He stated that Appellant told him that he had no cuts on his body on the day of the murder, and this was verified by counsel with other witnesses. Furthermore, during this pre-trial discussion, Appellant had stated that he often had small cuts on his hands, and that he was in the victim's apartment many times prior to the time of the incident when his blood could have stained the sheet. However, trial counsel was very surprised that Appellant did not repeat this explanation when he was asked, on cross-examination how he could account for the consistency between his blood type and the blood type of the stain found on the victim's sheet. (Post-trial Motions Hearing, at 29–30, July 27, 1988; *also see*, N.T. at 637, Volume II, April 15, 1988).

In the trial court's Opinion and Order denying Appellant's post-trial motions, the court found that Mr. Riester reviewed the significance of the blood stains with Appellant before the trial. (Trial Court Opinion at 10, September 22, 1989). The trial court evidently judged Mr. Riester to be more credible than Appellant, and did not believe Mr. Haynes' claim that he had not been apprised that the age of the blood stain was indeterminable.

The standard used for assessing counsel's stewardship is well established. We inquire first whether the underlying claim is of arguable merit, that is, whether the disputed action or omission was legally unsound. Then, we ask whether counsel had any reasonable basis for the questionable act or omission, and if there was such a basis our inquiry ends. If there is no reasonable basis, then Appellant will be granted relief only if counsel's improper course of conduct was prejudicial, resulting in an adverse

affect upon the outcome of the proceedings. *Commonwealth v. Davis,* 518 Pa. 77, 83, 541 A.2d 315, 318 (1988).

Since, we find that there is no merit to the underlying claim that counsel failed to review the blood stain evidence with Appellant, we find no ineffectiveness.

■ Next, Appellant claims trial counsel was ineffective for failing to present evidence to the jury concerning the indeterminate age of the blood stain, thus breaching defense counsel's duty to provide the jury with all evidence of an exculpatory nature. *Commonwealth v. Guerrisi,* 297 Pa.Super. 245, 443 A.2d 818 (1982).

Although we agree that counsel would be ineffective if exculpatory evidence were not introduced at trial, *Commonwealth v. Adams,* 465 Pa. 314, 350 A.2d 412 (1976), this is not the situation here. Mr. Riester cross-examined the forensic serologist, Ms. Austin, concerning the blood stain on the sheet. He asked Ms. Austin whether she was able to give the particular age of the stain, to which she replied negatively. (N.T. at 507, April 14, 1988). Although there is some confusion whether Mr. Riester was referring to the blood or urine stain found on the sheet, we believe that his questions immediately following resolved this confusion. These later questions all concerned the tests Ms. Austin performed on the blood stain which matched Appellant's blood, whereas the urine stain was consistent with the traits of the victim, and was still wet. It became clear that defense counsel was referring to the blood stain and not the victim's own urine stain. Furthermore, Mr. Riester referred to the blood stain in his closing remarks, thus alerting the jury to the problem of determining the age of the stain. Therefore, we again find that counsel was not ineffective, because the underlying claim, that he failed to introduce exculpatory evidence, is without merit.

■ Next, Appellant claims counsel was ineffective for instructing him not to testify at the suppression hearing, thereby leaving uncontroverted the detective's testimony that his uncounseled, inculpatory statements made while

Appellant was in custody, were unsolicited by the police and not violative of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He admits that although the decision not to testify was ultimately his, counsel was ineffective because his advice was so "unreasonable as to vitiate the knowing and intelligent decision not to testify," *Commonwealth v. Martin*, 346 Pa.Super. 129, 142, 499 A.2d 344 (1985). We disagree.

Mr. Riester testified at the hearing on post-trial motions that he had advised Appellant not to testify at the suppression hearing because it would be his word against four detectives and that if the suppression court should rule in favor of the Commonwealth then that factual finding would "bind us on appeal." Further, if Appellant chose to testify at the pre-trial hearing, the Commonwealth would then know in advance the nature of his testimony at trial and would have time to prepare for that testimony. Appellant then agreed and elected not to testify.

The law presumes that counsel was effective, therefore the burden of establishing ineffectiveness rests squarely upon the appellant. *Commonwealth v. Ellis*, 354 Pa.Super. 11, 510 A.2d 1253 (1986). In order to establish a valid claim of ineffectiveness, it must be shown that the course of action chosen by counsel was not reasonably designed to protect the client's best interests. *Commonwealth v. Chin*, 373 Pa.Super. 163, 540 A.2d 573 (1988).

We agree with the trial court, that Appellant made a rational decision not to testify, and that counsel's advice was not unreasonable as to vitiate this knowing and intelligent decision. Defense counsel believed that it was strategically important not to reveal the contents of Appellant's testimony in advance of trial, and Appellant agreed. This is a reasonable strategy for counsel to pursue. However, we can not understand why the fact that the suppression court's credibility/factual findings would bind Appellant on appeal should be a factor in deciding whether to testify. Testifying before the suppression court would not prevent Appellant from testifying to the same information at trial

as planned, whatever the suppression court's decision. Furthermore, the jury's finding of fact on this issue would be equally binding on appeal. Nonetheless, because we believe that it was reasonable for counsel to advise his client that it was strategically important not to testify at the suppression hearing in order not to reveal the contents of his testimony before trial, we hold that counsel was not ineffective for advising Appellant against testifying at the suppression hearing.

■ The fourth issue raised by Appellant is whether his statement to the Pittsburgh police should have been suppressed because the police were acting outside their jurisdiction in violation of the Municipal Police Jurisdiction Act [Act], 42 Pa.C.S.A. § 8953(a). According to the record, Detectives Bauer and McGuire entered Wilkinsburg, Pa., an independent municipality adjacent to Pittsburgh, to investigate the homicide without first contacting the Wilkinsburg police. This intrusion, it is contended, was not authorized under the Act, nor was it simply a technical violation of the Act which would not justify suppression of the evidence. *See, Commonwealth v. Mason,* 507 Pa. 396, 490 A.2d 421 (1985).

The Commonwealth concedes that the investigation outside the jurisdiction was not authorized under the Act, (N.T. at Vol. I 97, April 11, 1988), however, they argue that suppression of the evidence was not justified. We agree.

This court has held that the general purpose of the Municipal Police Jurisdiction Act is to restrict the jurisdiction of the police to their own municipalities, on the one hand, while allowing certain practical and policy exceptions to the general rule on the other. *Commonwealth v. Merchant,* 385 Pa.Super. 264, 560 A.2d 795 (1989) *alloc. granted* — Pa. ——, 575 A.2d 111 (1990). Furthermore, in *Commonwealth v. Saul,* 346 Pa.Super. 155, 499 A.2d 358 (1985), we held that the Act prohibits investigations as well as arrests and service of warrants outside the police officer's jurisdiction. However, in *Saul,* it was held that because of our supreme court's decision in *Commonwealth v.*

*Mason,* 507 Pa. 396, 490 A.2d 421 (1985), when a police officer made an unauthorized, controlled buy of illegal substances outside his jurisdiction, suppression of the evidence gained by the illegal investigation would be a remedy all out of proportion to the benefits gained. *Id.,* 499 A.2d at 361. Thus, we hold that although the investigation in Wilkinsburg violated the Act, and the Pittsburgh police were acting outside of their authority, this illegality is not a basis for granting suppression.

█ Next, we consider Appellant's claim that his inculpatory statements, made while in the police station, should have been suppressed based on the alleged trickery and deception employed by the police in gaining his "consent" to accompany them to the police station. This claim requires a two part analysis: (1) Whether Appellant gave his consent to accompany the police officer to the station as a result of trickery and deceit, and (2) If Appellant's consent was invalid, whether his statements made while in custody were tainted and therefore should have been suppressed.

█ Our standard of review for a suppression hearing is well established. Our responsibility is to "determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Hubble,* 318 Pa.Super. 76, 78, 464 A.2d 1236, 1237 (1983). Additionally, we must consider the prosecution's evidence and so much of the defendant's evidence as remain uncontradicted. *Commonwealth v. Mancini,* 340 Pa.Super. 592, 490 A.2d 1377 (1985). When ruling on suppression motions, the suppression court is required to make findings of fact and conclusions of law as to whether evidence was obtained in violation of the defendant's constitutional rights. (Pa.R. Crim.P. 323(i)).

We note initially that the suppression court denied the motion to suppress but did not make findings of fact on the record on this issue, nor did it discuss the suppression issues in its opinion in response to post-trial motions. Thus

we must consult the record directly to ascertain the facts of Appellant's arrest.

According to the testimony at the suppression hearing, Officers Bauer and McGuire of the City of Pittsburgh homicide squad went to Wilkinsburg at approximately 9:00 p.m. on August 7, 1987, to meet Appellant at the home of his girlfriend. The Officers knew of an outstanding bench warrant for Appellant, but were unsure of its status after three years. They informed him they were investigating the murder of Eddilee Sims but did not question Appellant about the murder. Instead, they discussed the outstanding bench warrant, and asked him to accompany them in the police car to the Pittsburgh police station to clear up this warrant problem.[1]

On the way down to the station in the police car there was only general conversation about whether the warrant was outdated or some clerk made a mistake, but immediately upon arriving at the Public Safety Building, Appellant was placed in an interrogation room and advised of his constitutional rights. When Appellant signed a waiver of rights form, and affirmed that he understood his rights, the police began to interrogate him concerning the murder of Eddilee Sims.

At approximately 10:15 p.m., after Appellant was told that his fingerprints and palm prints matched those on the door which had been forced open on the night of the murder, Appellant stated that he broke into the apartment, but did not murder Ms. Sims. More questions followed this statement, and then at 10:35, Appellant asked for a lawyer and the questioning stopped.

Although the testimony concerning the time when Appellant was placed under arrest is contradictory, it may be inferred from the record that some time between 10:45 and

1. Contrary to the Commonwealth's contention that Appellant agreed to go with the police officers to clear up the matter of the bench warrant and to be interviewed in regard to the murder, the Officer's testimony clearly reveals that the only purpose that Appellant was aware of was to check on the bench warrant matter. (N.T. April 11, 1988, at 31).

11:30, Appellant was told he was under arrest and the arrest warrant was executed. Then Appellant was taken to the Coroner's Office for arraignment.

While leaving the arraignment, Appellant offered the statement that he had broken into Ms. Sims' apartment with a person named Dan Smith and that Mr. Smith had killed Ms. Sims. Again, the officers read Appellant his rights and advised him of the felony-murder rule. Mr. Haynes continued to talk about Dan Smith on the ride back to and inside the Public Safety Building. However, when Mr. Haynes was asked to make a taped statement concerning the break-in, he declined to do so without his attorney. Questions about Mr. Smith and the break-in continued after this refusal.

Appellant first claims that his consent to go to the Public Safety Building was based on a false representation made to him by the police officers, and the falsity of that statement negates his consent. Our supreme court has said, that consent may not be gained through stealth, deceit or misrepresentation, and that if such exists this is tantamount to implied coercion. Moreover, it has stated that consent is invalid if at the time of the consent there is present duress or coercion, actual or implied. *Commonwealth v. Wright*, 411 Pa. 81, 85, 190 A.2d 709, 711 (1963) citing, *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); *Amos v. United States*, 255 U.S. 313 (1921).

However, since the 1963 *Wright* decision, *supra.*, the Supreme Court of the United States has held that the Fourth Amendment was not violated by certain forms of deception practiced by the police. Thus in *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), the Supreme Court held that the Fourth Amendment was not violated when a police informant or narcotics agent, respectively, misrepresented their identities to the defendant, and then the defendant voluntarily confid-

ed a wrongdoing to this undercover agent. However, the Supreme Court in both *Lewis* and *Hoffa* pointed out that in some instances police deception may violate the Fourth Amendment. In particular, the Court distinguished *Gouled, supra.*, in which an informant, known to the defendant, gained consent to enter the defendant's office and seized and carried away documents belonging to the defendant. This search and seizure, it was held, violated the Fourth Amendment.

Similarly, this court has held in *Commonwealth v. Morrison*, 275 Pa.Super. 454, 418 A.2d 1378 (1980), that there is no Fourth Amendment violation when an undercover agent misrepresents his identity and asks for and receives permission to view the inside of a defendant's barn. The agent saw marijuana inside the barn which provided the probable cause necessary to obtain a search warrant. However, we have held that if an accident victim consents to a blood test with no notice of the criminal investigative purpose of the test, then the consent is invalid. *Commonwealth v. Walsh*, 314 Pa.Super. 65, 460 A.2d 767 (1983).

We agree with Judge Spaeth that:

"The problem of defining the limits to be set on the use of police deception is one of the most difficult problems of the criminal law ... For when the police are permitted to resort to deception there are losses as well as gains. The gains may be considerable—for example, the detection and elimination of a carefully organized traffic in drugs. But the losses may also be considerable. The law of search and seizure is not concerned with protecting the criminal's right of privacy but the honest citizen's right. If we are to be able to enjoy liberty and pursue happiness, we must know what part of our world is real and what part is illusion—that our home is our castle, and not a broadcasting center for hidden police transmission devices ... Permit the police to make our world illusion, and no one, neither criminal nor honest citizen, will be free." *Commonwealth v. Morrison*, 275 Pa.Super. 454, 471, 418 A.2d 1378 (1980), (Spaeth, J., concurring).

 There appears to be a common thread running through these Supreme Court cases as well as the cases in this Commonwealth which may aid in determining when police deception is permissible. That common thread is that the deception must not pertain to the consent itself, in some sense it must be collateral to the content of the permission voluntarily granted. Thus, the accused must know what is being consented to, and if the police exceed the scope of that consent, then they have passed their limits of permissible deception. This is consistent with the line of cases which have held that if the accused does not understand what it was that was consented to, then the consent is invalid. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Commonwealth v. Dressner*, 232 Pa.Super. 154, 336 A.2d 414 (1975); *Commonwealth v. Dixon*, 226 Pa.Super. 569, 323 A.2d 55 (1974).

 Thus, if an informant only deceives the accused as to his or her identity, as in *Hoffa* and *Lewis*, where the accused consented to the informant's presence in the room at the time of an illicit conversation, then the deception is collateral and permissible. However, if the accused consents to an informant's presence in his office, and then the informant then searches the office when the defendant leaves for a few minutes, or if the accused consents to the taking of a blood sample for non-criminal purposes and then the blood sample is used for testing blood alcohol content for criminal charges, the deception pertains to the consent itself, and the police have exceeded the scope of that consent. (*See, Gouled, supra; Walsh, supra.*)

Here, the police deceived the defendant concerning the reason for going to the Public Safety Building. Mr. Haynes consented to go in order to clear up the matter of the outstanding bench warrant. However, immediately upon entering the Public Safety Building, he was placed in an interrogation room, read his rights, and interrogated on the homicide. It appears that this deception was practiced on Appellant because, as the police admit, they did not have probable cause to arrest Appellant at his girlfriend's home,

and they could not arrest him on the outstanding bench warrant in Wilkinsburg, because they would be acting in a location outside their jurisdiction. They therefore deceived him by stating that the purpose of their trip was other than it was. We hold that such deception was impermissible and the consent was invalid because it pertains to the content of the consent itself. Therefore, Appellant was taken into custody illegally.

Next, we must decide whether the statements made during the interrogation at the police station must be suppressed. It does not necessarily follow that because the custodial detention was illegal, the statements made were the fruit of that initial illegality. As the Supreme Court said in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), that "granting establishment of the primary illegality, [it must be determined whether] the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

In *Brown v. United States*, 422 U.S. 590, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416 (1975), the Supreme Court articulated several factors to be considered in scrutinizing an individual case: (1) whether Miranda warnings were given; (2) the temporal proximity of arrest and confession; (3) the presence of intervening circumstances, and, (4) the purpose and flagrancy of the official misconduct. *See, Commonwealth v. Bogan*, 482 Pa. 151, 393 A.2d 424 (1978).

In the instant case, Miranda warnings were given prior to any interrogation. However, the inculpatory statement was made after about one hour and 15 minutes of interrogation. The short amount of time between the primary illegality and the statement is not in itself sufficient to dissipate the taint. *Cf., Commonwealth v. Farley*, 468 Pa. 487, 364 A.2d 299 (1976).

The first inculpatory statement, admitting the break-in at Ms. Sims house, was made after Appellant was confronted

with the evidence that his fingerprints and palm print were found on pieces of the door which showed signs of forced entry.[2] Up until that time, Mr. Haynes had denied being at the apartment at the time of the break-in and murder, and it was the fingerprint evidence which prompted his statement. This development, rather than any exploitation of an illegal arrest, prompted Mr. Haynes' incriminating admission.

We have held that when a suspect makes a damaging admission when confronted with evidence such as, that the suspect matched the description of the assailant, *Commonwealth v. Bogan*, 482 Pa. 151, 158, 393 A.2d 424 (1978), or that a co-conspirator named the suspect as the individual who shot an individual during a gang war, *Commonwealth v. Fogan*, 449 Pa. 552, 557, 296 A.2d 755 (1972), "intervening circumstances" are present such that it may not be said that the acquired evidence has been directly derived from, and thereby tainted by the illegal arrest. *Commonwealth v. Farley*, 468 Pa. 487, 364 A.2d 299 (1976).

Finally, we must look at the purpose and flagrancy of the official misconduct. Although, we may suppose that the deception was purposeful, in that Appellant was persuaded to undergo custodial interrogation when otherwise the police would have had no legal basis to arrest him at his house and transport him to police headquarters, we do not find that the act was flagrant. Flagrant illegality would include actions such as a dragnet arrest specifically condemned by the courts of this Commonwealth, *see, Id.*, 468 Pa. at 496, 364 A.2d 299; *Fogan, supra.*, 449 Pa. at 556, 296

---

**2.** Appellant claims that at the time the first inculpatory statement was made, no evidence in the possession of the police department indicated that the palm print on the exterior of the door belonged to Appellant, and this trickery coerced this statement from him. Although this is literally true, the detective in charge of the interrogation testified that prior to the interrogation he had had a conversation with the fingerprint expert in which both agreed to almost a hundred per cent certainty that whoever's finger prints were on one side of the door panel which had been removed, the palm prints matched because they were in perfect configuration. Therefore, because the detective knew that the fingerprints matched Appellant's, he assumed that the palm print was Appellant's. Thus, the statement that Appellant's palm prints matched those found on the door does not rise to the level of trickery or implied coercion.

A.2d 755, or police misrepresentation that they possessed a warrant in order to gain consent.

The misconduct here, though serious, does not rise to the level of flagrant illegality. Therefore, because we find that *Miranda* warnings were given following the illegal arrest, and there were intervening circumstances between the arrest and statement, although the time period was short, and because there was no flagrant misconduct by the police, the inculpatory statements were not the result of the exploitation of the initial illegality. Consequently, we affirm that the statements should not have been suppressed because they had been purged of their initial taint.

Although inartfully stated, Appellant next claims that the exclusion of one of his voir dire questions, which asked whether the juror would be reluctant to impose a life sentence knowing that the crime of first degree murder carries this penalty, was error. Appellant relies on *Commonwealth v. White*, 366 Pa.Super. 538, 531 A.2d 806 (1987), for the principle that a life qualifying, as well as a death qualifying, question is permissible.

We disagree. *White* stands for the principle that it is "permissible" for the Commonwealth to ask such questions during voir dire if they were asked in furtherance of the proper purpose of determining whether prospective jurors can eliminate the influence of any scruples and render a verdict according to the evidence. Therefore, *White* held it was not improper to ask such a question which informed the jury of the penalty for first-degree murder.

We note at the outset that the scope of voir dire rests in the sound discretion of the trial judge, and this decision will not be reversed unless palpable error is established. *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977). We do not think it an abuse of discretion to exclude a voir dire question which is merely permissible and not required. Moreover, a proposed question of this sort from the defense, rather than the Commonwealth, suggests that the question is animated by an improper purpose,

because it is in the defense' interest to secure jurors who find the penalty so distasteful as to find the accused not guilty regardless of the evidence. In contrast, when the Commonwealth asks such a question, it is in its interest to determine whether a venireperson can overlook a settled prejudice against imposing a life sentence, in order to decide the case on the evidence. This interest coincides with the purpose of voir dire, to provide the accused with a competent, impartial and unprejudiced jury. *Commonwealth v. Hathaway*, 347 Pa.Super. 134, 500 A.2d 443 (1985). Thus, we find that the court did not abuse its discretion in excluding Appellant's "life qualifying" question.

Next, Appellant claims that he was entitled to an instruction on the elements of voluntary and involuntary manslaughter. He argues that the evidence in this case did not indicate why this homicide occurred and, therefore, did not rule out or eliminate the possibility that the charges of voluntary or involuntary manslaughter could be returned by the jury. We disagree.

The law in this area has evolved slowly, but it is now clear that *Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974), and *Commonwealth v. Gartner*, 475 Pa. 512, 381 A.2d 114 (1977), upon which Appellant relies for the proposition that the court must instruct a jury in the offenses of voluntary and involuntary manslaughter as lesser included offenses of homicide despite there being no evidence to support such a verdict, are no longer valid.

*Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399 (1980), and *Commonwealth v. Williams*, 490 Pa. 187, 415 A.2d 403 (1980), held that an instruction on involuntary manslaughter may be given only where the evidence would support such a verdict. Later, *Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328 (1983) held that a trial court may charge on the "unreasonable belief" subclass of voluntary manslaughter only where evidence exists that would support such a verdict. The majority in *Carter* did not decide the propriety of the practice of charging the jury on "heat of passion" voluntary manslaughter in the absence of evi-

dence of such passion. Subsequently, however, this court has stated in *Commonwealth v. Toledo*, 365 Pa.Super. 224, 231, 529 A.2d 480, appeal denied 517 Pa. 622, 538 A.2d 876 (1987):

> The fact that *Jones* has not been overruled expressly by the Supreme Court does not mean that inferior courts can blithely ignore the subsequent history of its holding. In view thereof, we will not hold, as appellant would have us do, that the trial court committed error by refusing a defense request to charge on "heat of passion" voluntary manslaughter where such a defense was not made an issue at trial where the evidence would not reasonably have supported such a finding. We are unable to conclude rationally that a different rule should obtain where voluntary manslaughter is based on "heat of passion" than where it is based on unreasonable belief.

In the instant case, neither "heat of passion," nor "unreasonable belief," voluntary manslaughter, nor involuntary manslaughter was made an issue at trial. There was no evidence presented concerning the death of Eddilee Sims which would support such a finding. Appellant claimed in his defense that he did not kill the victim, and the supreme court has held that when such a defense is proffered, it is proper to omit an instruction on involuntary manslaughter. *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988). We hold, that by the same logic, it is proper to omit a charge of voluntary manslaughter.

Moreover, the absence of such an instruction in this case was harmless. In the present case, the trial court instructed on first, second, and third-degree murder. The jury could have exercised its mercy dispensing power and brought in a verdict of third or second degree murder. Instead they found Appellant guilty of first degree murder. We conclude, as did this court in *Commonwealth v. Mays*, 361 Pa.Super. 554, 563, 523 A.2d 357 (1987), that Appellant suffered no prejudice from the denial of the charge of voluntary or involuntary manslaughter.

 Next, Appellant claims that the trial court erred in refusing to instruct the jury on the defense of voluntary intoxication. While it is indeed true that voluntary intoxication can negate the specific intent to kill which is otherwise required for conviction of first degree murder, *Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986), we find no merit in the contention that failure to instruct the jury in the instant case was error.

This matter is controlled by *Commonwealth v. Reiff*, 489 Pa. 12, 413 A.2d 672 (1980). In *Reiff*, the Appellant introduced evidence at trial that he had consumed two and one-half quarts of beer in a bar prior to the fatal shooting, however, the trial court refused to instruct on voluntary intoxication and the defendant was convicted of murder of the first-degree. The supreme court held there was no error in this refusal because:

> Drinking and intoxication are not synonymous terms; therefore a jury instruction on intoxication is not warranted because evidence of drinking is introduced at trial. It is the intention of the legislature that a defendant be overwhelmed or overpowered by alcoholic liquor to the point of losing his or her faculties or sensibilities before an intoxication instruction be given. *Rieff, supra.*, 489 Pa. at 15, 413 A.2d 672.

In the instant case there was no evidence of intoxication introduced, nor was there even any attempt to calculate the amount of alcohol consumed. The only evidence was that Appellant had frequented several bars on the evening of the homicide. Therefore, it was not error for the court to refuse to instruct the jury on intoxication as a defense to the charge of murder.

 Next, Appellant argues that the court erred in stating in its charge that the malice requirement for first, second, and third degree murder could be presumed from the underlying felony of burglary. This is simply a misstatement of the charge. The court charged only that the malice required for second-degree murder could be presumed or inferred from the underlying felony of burglary.

As this is a correct statement of the law; a jury may infer malice from the underlying felony of second-degree murder, we find no error in the charge. *Commonwealth v. Legg*, 491 Pa. 78, 417 A.2d 1152 (1980).

Next, Appellant claims that his motion for a directed verdict should have been granted because there was insufficient evidence to prove beyond a reasonable doubt that the accused was guilty of the crimes charged. We disagree.

In reviewing a claim challenging the sufficiency of the evidence the following standard applies:

> Whether accepting as true all the evidence viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, the trier of fact could have found that each element of the offenses charged was supported by the evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt. *Commonwealth v. Gamber*, 352 Pa.Super. 36, 506 A.2d 1324 (1986), citing *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1952).

We believe that a review of the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences from that evidence, clearly supports the view that the evidence was sufficient in law to prove every element of the crimes of burglary and first degree murder. The circumstantial evidence of the finger and palm prints of Appellant, as well as the blood stain evidence, coupled with his admission, which was equivalent to a confession of burglary, was more than enough for the jury to find Appellant guilty beyond a reasonable doubt. We therefore find no merit to this claim.

Finally, Appellant claims that the verdict was against the weight of the evidence. The decision whether to grant a new trial on the ground that verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge, and that decision will not be reversed on appeal unless the verdict is so contrary to the evidence

as to make the award of a new trial imperative so that right may be given another opportunity to prevail. *Commonwealth v. Taylor*, 324 Pa.Super. 420, 471 A.2d 1228 (1984); *Commonwealth v. Hamilton*, 376 Pa.Super. 404, 546 A.2d 90 (1980).

The trial judge was able to observe the demeanor of the witnesses as they offered their evidence and was satisfied that the jury's verdict was justified. This resolution will not be disturbed unless this is tantamount to a miscarriage of justice. *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987). In the case *sub judice*, the verdict is clearly supported by the evidence, and thus can not be equivalent to a miscarriage of justice. The trial court did not abuse its discretion in denying Appellant's motion to reverse on the ground that the verdict was against the weight of the evidence.

Judgment of sentence is affirmed.

HUDOCK, J., concurs in the result.