J-A03028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MERCEDES MANJARREZ TORRES | |
| Appellee | No. 1255 MDA 2014 |

Appeal from the Order Entered June 25, 2014
In the Court of Common Pleas of York County
Criminal Division at No: CP-67-CR-0006844-2013

BEFORE:  MUNDY, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED JUNE 25, 2015**

The Commonwealth appeals from the June 25, 2014 order entered in the Court of Common Pleas of York County, granting the pre-trial suppression motion filed by Appellee, Mercedes Manjarrez-Torres (Torres). For the reasons that follow, we reverse and remand.

Based on a criminal complaint dated July 30, 2013, Torres was arrested and charged with two counts of delivery of cocaine and one count of conspiracy to possess cocaine with intent to deliver.[1]  Torres filed a motion to suppress evidence, contending an agent of the Attorney General's

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30) and 18 Pa.C.S.A. § 903 (35 P.S. § 780-113(a)(30)), respectively.  The date of the first alleged delivery was January 27, 2012.  The second delivery allegedly occurred on September 21, 2012.

Narcotics Division enlisted a police officer, Corporal David Ogle, to deceive Torres into providing personal identifying information. Torres asserted that the ruse employed by the officer escalated his exchanges with Torres to the level of an investigative detention in violation of Torres' constitutional right of privacy. He further claimed the officer's use of deceit to obtain his identity violated his rights against self-incrimination.

Following an April 29, 2104 hearing, the suppression court issued the following findings of fact:

This [c]ourt finds the testimony of the officers who testified to be credible. Pursuant to that determination, the court makes the following factual findings:

1. On March 29, 2013 at approximately 10:30 a.m., Narcotics Officer Mike Carlson, Agent Castaneda and Officer David Ogle met and a plan was developed to make contact with the registered owner of the white Ford F-150 pickup truck in order to reveal the actual driver [of] that vehicle who [had] accompanied Jose Solorzano on several occasions to deliver cocaine to Luis Ocampo. On one occasion, the person in question actually delivered an amount of cocaine to Mr. Ocampo who in turn delivered [it] to Agent Castaneda. On the same date at approximately 11:00 a.m., Agent Carlson and Officer Ogle attempted to make contact with a resident at 16 Carly Drive, New Oxford, Pennsylvania which produced negative results and the officers departed the area.

2. At approximately 12:30 p.m., Agent Castaneda testified that he received a phone call from Officer Ogle advising that the white pickup truck was parked at 16 Carly Drive. A "false" story was developed and a plan to approach the driver of the vehicle. Agent Castaneda wanted Officer Ogle to come up with a cover story because the matter was still before a grand jury and it was important for [Torres] not to know he was under investigation. Officer Ogle knocked on the house door and [Torres] answered and when asked who was the owner of the white pick-up truck, [Torres] indicated it was his vehicle.

[Torres] stepped outside and was told that someone in the same type of vehicle was involved in a drive off without paying for gas. Officer Ogle asked for [i]dentification which [Torres] provided and also if [Torres] would consent to having his picture taken, which he did.

3. Officer Ogle also asked [Torres] if he lived at the residence and [Torres] stated that he could also be found at 216 Penn Street, Hanover[,] Pennsylvania. [Torres] also provided the Officer with his phone number.

4. Agent Castaneda testified that he had been purchasing cocaine from . . . an individual driving an F-150 truck and the agents had been tracking Mr. Ocampo by a pen register on his phone. On September 21, 2012, Agent Castaneda arranged to buy more narcotics from Ocampo. Ocampo was followed to a Rutters [gas station] at Route 616 and Market Street and the witness observed a white [F-150] truck meeting with Ocampo at that location. [Torres] was at the scene. Based on these events, Agent Castaneda believed the driver of the [F-150] was supplying the cocaine to Ocampo. The agents ran the registration and [the registered owner] was not [Torres].

5. Agent Castaneda indicated that they did not want to do a traffic stop and arrest [Torres] because they did not want [Torres] to be aware of the ongoing investigation.

6. Following receipt of the information, the agents conducted a trash pull at the residence of 216 Penn Street. In searching the trash bag, mail was located in the name of [Torres.]

Suppression Court Order, Findings of Fact, 6/25/14, at 3-4.

The suppression court rejected the Commonwealth's assertion that the interactions between Corporal Ogle and Torres constituted mere encounters, finding instead that the conduct of the officer amounted to "a seizure of the person[,]" noting:

- 3 -

> Corporal Ogle arrived at a specific private residence, knocked on the door and while in full uniform with his sidearm visible[2], requested to speak to the operator of the [w]hite Ford [F-150]. He stated that he was investigating a theft of gasoline that had occurred by use of a similar vehicle. After [Torres] advised it was not his truck used in the offense, [Torres], upon request, provided his identification and later, upon request, allowed his photograph to be taken.

Suppression Court Order, Legal Findings, 6/25/14, at 5.

The suppression court next considered whether reasonable suspicion existed to support an investigative detention and concluded it did not, in light of the lack of any testimony indicating there was criminal activity afoot. Therefore, the court concluded, the investigative detention violated Torres' rights under the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *Id.* at 4-6. The court further determined Torres' rights against self-incrimination under the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution were violated because Torres was "compelled to provide his identity in order to comply with a police investigation of a non-existent crime." *Id.* at 6. Because the "consent to search given under false

---

[2] Although not mentioned in the suppression court's findings of fact, we acknowledge Corporal Ogle was in full uniform when he knocked on the door on Carly Drive. Notes of Testimony (N.T.) Suppression Hearing, 4/29/14, at 7. However, there was no mention during the suppression hearing of Corporal Ogle's firearm or whether it was visible, as the suppression court suggests in its legal findings.

pretenses [was] not truly voluntary," *id.* at 6-7, the court granted Torres'

motion to suppress. *Id.* at 7.

The Commonwealth filed a timely appeal from the June 25, 2014

order, certifying in its notice of appeal that the suppression order would

terminate or substantially handicap its prosecution. *See* Pa.R.A.P. 311(d).

The Commonwealth presents four issues for this Court's consideration:

> A. Does a casual conversation outside a residence constitute a mere encounter?
>
> B. Did Torres lawfully consent to have his photograph taken?
>
> C. Does a reasonable expectation of privacy exist in one's trash abandoned outside their property?
>
> D. Does a person have a reasonable expectation of privacy in his identity, address or his photograph taken in public?

Commonwealth Brief at 4.[3]

As this Court has recognized, when reviewing the grant of a

suppression motion, we apply the following scope and standard of review:

> In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the

---

[3] In its 1925(b) statement of errors complained of on appeal, the Commonwealth raised six issues, including the four presented to this Court on appeal. In the trial court's Rule 1925(a) opinion, which was authored by a different judge from the one who issued the order granting suppression, the court dismissed the Commonwealth's alleged errors, largely deferring to the reasoning set forth in the suppression court's order as the basis for rejecting the Commonwealth's allegations of error. *See* Rule 1925(a) Opinion, 9/22/14.

suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.

Moreover, if the evidence supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusions drawn from those findings.

*Commonwealth v. Burgos*, 64 A.3d 641, 647 (Pa. Super. 2013) (quoting

*Commonwealth v. Powell*, 994 A.2d 1096, 1101 (Pa. Super. 2010)).

Again, this Court is bound by the findings of the suppression court that are supported by the record. Because this is an appeal by the Commonwealth, we must consider only the evidence of Torres' witnesses and the evidence of the Commonwealth that remains uncontradicted in the context of the record. *Id.*

Here, Torres did not present any witnesses at the suppression hearing. The only witnesses who testified were Corporal Ogle and Agent Castaneda, both of whom testified for the Commonwealth. Absent any witnesses for Torres, this Court must determine whether the suppression court's factual findings are supported by the evidence of the Commonwealth that remains uncontradicted in the context of the record.

As the trial court recognized in its Rule 1925(a) opinion, the Commonwealth complained of a factual misstatement by the suppression court with respect to Torres answering the door when Corporal Ogle knocked on the door at the Carly Drive residence. Rule 1925(a) Opinion, 9/22/14, at 3-4. "[A]ccording to Corporal Ogle's testimony during the suppression

hearing, another individual initially answered the door and [Torres] came to the door shortly after. *Id.* at 3 (citing N.T. Suppression Hearing, 4/29/14, at 7-8). The trial court determined that "this factual error is immaterial and has no bearing on the accuracy of the thorough legal analysis done by the suppression court. Therefore, the [c]ourt finds that the [Commonwealth's] first argument [concerning a factual finding not supported by the record] is without merit." *Id.* at 4.

With the exception of the suppression court's misstatement concerning who initially answered the door when Corporal Ogle knocked, we find the suppression court's factual findings are supported by the record. Therefore, we are bound by them and will reverse the suppression court's order only if there is error in the legal conclusions drawn from its findings. *Burgos*, 64 A.3d at 647.

In its first issue, the Commonwealth asserts the suppression court erred in its legal conclusion that the interaction between Corporal Ogle and Torres constituted an investigative detention rather than a mere encounter and, as a result, erred in suppressing statements made to Corporal Ogle by Torres to Ogle during the interactions based on Fourth Amendment grounds. We agree with the Commonwealth's contention.[4]

_____

[4] In its brief, the Commonwealth attempts to bifurcate the exchanges between Corporal Ogle and Torres into what can be characterized as "pre-ruse" and "post-ruse," suggesting the statement by Torres that he owned

*(Footnote Continued Next Page)*

In ***Commonwealth v. Boswell***, 721 A.2d 336 (Pa. 1998), our Supreme Court explained:

> Interaction between police and citizens may be characterized as a "mere encounter," an "investigative detention," or a "custodial detention." Police may engage in a mere encounter absent any suspicion of criminal activity, and the citizen is not required to stop or to respond. ***Commonwealth v. Vasquez***, 703 A.2d 25, 30 (Pa. Super. 1997). If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. ***Commonwealth v. Jackson***, 428 Pa. Super. 246, 249, 630 A.2d 1231, 1233 (1993). If the interaction rises to the level of an investigative detention, the police must possess reasonable suspicion that criminal activity is afoot, and the citizen is subjected to a stop and a period of detention. ***Id.*** Probable cause must support a custodial detention or arrest. ***Id.***
>
> To decide whether a seizure has occurred, we apply the following objective test: "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." [***Florida v. Bostick***, 501 U.S. 429, 439 (1991)]. In applying this test, it is necessary to examine the nature of the encounter. ***Commonwealth v. Lewis***, 535 Pa. 501, 508, 636 A.2d 619, 623 (1994). Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. ***Terry v. Ohio***, [392 U.S. 1 (1968)], ***supra;*** [***Interest of Jermaine***, 582 A.2d 1058, 1060–61 (Pa. Super. 1990)]. ***See also United States v. Mendenhall***, 446 U.S. 544, 100 S.Ct. 1870, 64

*(Footnote Continued)* —————————

the truck was offered before the ruse involving the gas station drive-off was mentioned. We reject the proposed bifurcation, recognizing the ruse is what brought Corporal Ogle to the door in the first place. However, in light of our conclusion that the exchanges were mere encounters, the issue of bifurcation loses any import it might otherwise have had.

L.Ed.2d 497 (1980). "[O]therwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." ***Mendenhall***, [446 U.S.] at 555, 100 S.Ct. 1870.

***Id.*** at 340.

The United States Supreme Court addressed Fourth Amendment protections in ***Florida v. Jardines***, 133 S.Ct. 1409 (U.S. 2013), explaining:

The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. ***Oliver v. United States***, 466 U.S. 170, 176, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The Fourth Amendment does not, therefore, prevent all investigations conducted on private property . . . .

But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." ***Silverman v. United States***, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.

We therefore regard the area "immediately surrounding and associated with the home"—what our cases call the curtilage—as "part of the home itself for Fourth Amendment purposes." ***Oliver, supra***, at 180, 104 S.Ct. 1735. That principle has ancient and durable roots. . . . This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." ***California v. Ciraolo***, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

***Id.*** at 1414-15 (some citations omitted).

The exchanges between Corporal Ogle and Torres took place on the driveway, just outside the side door of the residence at 16 Carly Drive. As

such, the exchanges took place in the curtilage of the residence, a part of the home for Fourth Amendment purposes. *See Oliver v. United States*, 466 U.S. at 180. Therefore, as instructed by *Jardines*, we must consider whether Corporal Ogle's investigation was accomplished through "an unlicensed physical intrusion." *Id.* at 1415.

Unlike the officers in *Jardines* who entered onto the porch of Jardines' residence with a drug-sniffing dog, Corporal Ogle simply walked up to the door at 16 Carly Drive, knocked on the door, and asked the individual who answered if the white F-150 belonged to him. The individual responded "no," and indicated Torres was the owner. At that point, Torres stepped forward, and apparently stepped outside onto the driveway, and said the F-150 belonged to him.

In *Jardines*, the United States Supreme Court discussed license to enter upon someone's property, noting:

> "A license may be implied from the habits of the country," notwithstanding the 'strict rule of the English common law as to entry upon a close.' *McKee v. Gratz*, 260 U.S. 127, 136, 43 S.Ct. 16, 67 L.Ed. 167 (1922) (Holmes, J.). We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

- 10 -

*Id.* at 1415-16 (some quotations and citations omitted). ***See also***
***Commonwealth v. Gibson***, 638 A.2d 203, 207 (Pa. 1994) ("the police
have the power to knock on the doors of the citizens of this Commonwealth
for investigatory purposes without probable cause").

Based on the testimony of Corporal Ogle, testimony the suppression
court found credible, ***see*** Suppression Court Order, 6/25/14, at 3, we reject
the suppression court's legal conclusion that "a seizure of [Torres'] person
occurred." *Id.* at 5. As Corporal Ogle explained, Torres came out of the
house after indicating the F-150 was his vehicle and they "were just talking."
N.T. Suppression Hearing, 4/29/14, at 9. When Corporal Ogle advised
Torres that a vehicle fitting the description of his F-150 had been involved in
a drive-off at a nearby gas station, Torres replied that he always used a
credit card so it could not have been his vehicle. Corporal Ogle asked for
identification and Torres produced his driver's license from his wallet in the
course of their "casual conversation" that lasted "[j]ust a couple minutes."
*Id.* at 9-10, 19. Corporal Ogle left the Carly Drive residence but later
returned. He knocked on the door and this time Torres answered and again
came out of the house onto the driveway. Corporal Ogle asked if he could
get a photograph of Torres, explaining the gas station had a surveillance
video and that if the photo did not match the video he would not be
contacted. *Id.* at 9-10. Torres agreed. He also offered a second address of

216 Penn Street and gave a phone number. *Id.* at 10-11. Corporal Ogle did not have any subsequent contact with Torres. *Id.* at 12.

Even accepting the suppression court's Findings of Fact Numbers 2 and 3, *supra*—relating to the interaction between Corporal Ogle and Torres—when the circumstances surrounding the exchanges between those individuals are considered in the context of those identified in **Boswell**, *e.g.*, the number of officers present, whether the officer informed Torres he was suspected of criminal activity, the officer's demeanor and tone of voice, the location and timing of the interaction, and the questions asked, it is clear the contact between Corporal Ogle and Torres was inoffensive and did not amount to a seizure of Torres but rather was a mere encounter. The suppression court's determination to the contrary constitutes legal error. "As the United States Supreme Court stated in [**Bostick**, 501 U.S. at 439], 'The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation.'" **Commonwealth v. Gonzales**, 979 A.2d 879, 887 (Pa. Super. 2009). The suppression court erred by suppressing the statements provided by Torres to Corporal Ogle based on the Fourth Amendment.

We note that our conclusion is not altered by the fact the encounter with Torres was undertaken as part of a "ruse." In **Commonwealth v. Haynes**, 577 A.2d 564 (Pa. Super. 1990), this Court examined cases involving police deceit and announced:

> There appears to be a common thread running through these Supreme Court cases as well as the cases in this Commonwealth which may aid in determining when police deception is permissible. That common thread is that the deception must not pertain to the consent itself, in some sense it must be collateral to the content of the permission voluntarily granted. Thus, the accused must know what is being consented to, and if the police exceed the scope of that consent, then they have passed their limits of permissible deception. This is consistent with the line of cases which have held that if the accused does not understand what it was that was consented to, then the consent is invalid.

*Id.* at 571-72 (citations omitted). Here, in response to information that a vehicle matching the description of his F-150 truck may have been involved in a gas station drive-off, Torres consented to providing identification and understood that identification was what Corporal Ogle requested. His consent was valid. Therefore, the "deception" employed by Corporal Ogle was permissible in the context of the encounter that took place.

In its second issue, the Commonwealth argues the suppression court erred by suppressing the photograph of Torres taken by Corporal Ogle because Torres lawfully consented to having his photograph taken. As the Commonwealth asserts, Corporal Ogle did not coerce or compel Torres to have his picture taken. In its Rule 1925(a) opinion, the trial court contends "[t]he legal findings in the suppressions court's [o]rder granting [Torres'] motion to suppress thoroughly cover the grounds for invalidating this argument." Rule 1925(a) Opinion, 9/22/14 at 5. Consequently, the trial court deferred to the suppression court's opinion "and reiterates its logic." *Id.*

- 13 -

The only mention of the photograph in the suppression court's findings of fact appears in Finding of Fact Number 2, in which the suppression court determined "Officer Ogle asked for Identification which [Torres] provided and also if [Torres] would consent to having his picture taken, which he did." Suppression Court Order, 6/25/14, at 3. In its legal findings, in the course of concluding that a seizure of Torres' person occurred, the suppression court explained:

> Corporal Ogle arrived at a specific private residence, knocked on the door and while in full uniform with his sidearm visible, requested to speak to the operator of the White Ford [F-150]. He stated that he was investigating a theft of gasoline that had occurred by use of a similar vehicle. After [Torres] advised it was not his truck used in the offense, [Torres], upon request, provided his identification and later, upon request, allowed his photograph to be taken.

*Id.* at 5. The suppression court proceeded to consider whether, in light of the fact a seizure occurred, reasonable suspicion existed to support Corporal Ogle's investigation. There was no further discussion of the photograph. Therefore, it is not clear what findings of the suppression court were deemed by the trial court to "thoroughly cover the grounds for invalidating this argument." Rule 1925(a) Opinion, 9/22/14, at 5.

The testimony of Corporal Ogle, which the suppression court found credible, supports the Commonwealth's position that Torres consented to being photographed. For that reason, and because we have already determined that the exchanges between Corporal Ogle and Torres constituted a mere encounter, the "fruit of the poisonous tree" claim by

Torres in his suppression motion does not find support in the record. The suppression court erred by suppressing the photograph of Torres taken by Corporal Ogle.

In its third issue, the Commonwealth argues the suppression court committed error by suppressing evidence found in the trash at Torres' 216 Penn Street address. We agree. In **California v. Greenwood**, 486 U.S. 35 (1988), the United States Supreme Court concluded that the Fourth Amendment does not "prohibit[] the warrantless search and seizure of garbage left for collection outside the curtilage of a home." **Id.** at 37. Likewise, this Court voiced its preference for "the view adopted by every United States Court of Appeals to consider the issue, that placing trash for collection is an act of abandonment which terminates any fourth amendment protection." **Commonwealth v. Minton**, 432 A.2d 212, 217 (Pa. Super. 1981) (footnote omitted).

Torres did not have any legitimate expectation of privacy in the mail and other items recovered from a trash bag left in an alley at the rear of the Penn Street residence. For that reason and because we have rejected Torres' "fruit of the poisonous tree" claim, we conclude the suppression court erred in suppressing items recovered in the trash pull in the alley located at the rear of 216 Penn Street.

In its fourth issue, the Commonwealth argues that the suppression court erred in suppressing information relating to Torres' identity, his address and his photograph taken in public. We agree.

In **Commonwealth v. Campbell**, 862 A.2d 659 (Pa. Super. 2004), this Court stated that "[a] person's name and address, by themselves, do not constitute information about which a person can have a reasonable expectation of privacy that society is willing to recognize." **Id.** at 664 (quoting **Commonwealth v. Duncan**, 817 A.2d 455, 458-59 (Pa. 2003)). Further, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." **Id.** (citations omitted).

In **Campbell**, this Court determined that questioning an individual about identity does not constitute a Fourth Amendment seizure but left for another day the issue of a passenger's right not to respond and the implication of Fifth Amendment claims, recognizing they were not before the Court. **Id.** at 665. Torres raised the Fifth Amendment in his suppression motion and the suppression court agreed that Torres' statement revealing his identity was obtained in violation of his Fifth Amendment rights. Suppression Court Order, 6/25/14, at 6.

Citing **Commonwealth v. Durr**, 32 A.3d 781 (Pa. Super. 2011), the suppression court stated that the Fifth Amendment and Article I, Section 9 of the Pennsylvania Constitution "privilege[d] him not to answer official

questions put to him informally where the answers might incriminate him in future criminal proceedings." Suppression Court Order, 6/25/14, at 6. However, in **Durr**, this Court concluded that "since the request for identification . . . transpired during a mere encounter, there was no compulsion to respond." **Durr**, 32 A.3d at 786.

Likewise, the exchanges between Corporal Ogle and Torres in this case constituted a mere encounter. Corporal Ogle did not threaten Torres or act in any manner that suggested Torres had been seized and was compelled to comply. Therefore, as in **Durr**, for Fifth Amendment purposes Torres was not compelled to reveal his identity.

Further, with respect to the photograph, Torres elected to answer the door and exit the Carly Drive residence when Corporal Ogle knocked the second time. As the Commonwealth contends, Torres was then in public and Corporal Ogle was within his rights to photograph him in the driveway. Moreover, Torres consented to having his picture taken. Torres had no expectation of privacy in the photograph.

Torres had no expectation of privacy in his name, his address or his photograph. Therefore, the suppression court erred in suppressing those items.

We conclude the suppression court failed to apply the law properly to the facts of this case based on the evidence of the prosecution that, when read in the context of the entire record, remained uncontradicted. This is

not to suggest that we have in any way disregarded the suppression court's findings of fact, to the extent they are supported by the record. Instead, it is a matter of this Court also considering uncontradicted prosecution evidence not included in the suppression court's findings of fact, evidence necessarily considered for proper application of law to the facts.

Order reversed. Case remanded for further proceedings consistent with this Memorandum. Jurisdiction relinquished.

Judge Mundy joins the memorandum.

Justice Fitzgerald concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/25/2015