671 A.2d 668

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Daren S. BROWDIE, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 19, 1995.

Decided Feb. 20, 1996.

Robert L. Foreman, Pittsburgh, for Daren Browdie.

Claire C. Capristo, Pittsburgh, Michael W. Streily, for Commonwealth.

Composition of the Court NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

***OPINION***

CASTILLE, Justice.

The issue in this appeal is whether a trial court is required to charge the jury on voluntary manslaughter where there is no evidence of record to support such a verdict. For the reasons expressed below, we affirm the order of the Superior Court affirming appellant's judgment of sentence.

A summary of the evidence giving rise to appellant's conviction is that Shannon Whitaker and her two month old baby, the victim, moved to Pittsburgh in mid December 1990. Whitaker met appellant in late January 1991 and they soon became romantically involved. Whitaker and appellant moved into an apartment together on April 1, 1991 and they married shortly thereafter. From the beginning, appellant appeared to display fondness for the victim and often fed her, prepared her bottle, bathed her and changed her diapers.

During the period of time appellant and the baby's mother first lived together, the baby was normal, happy, and healthy with no reported ailments or problems. In fact, on April 15, 1991, the baby's pediatrician confirmed the baby's general good health during the baby's regular six month examination. However, on May 17, 1991, during an examination which the mother scheduled because the baby had a cold, the pediatrician noted that the baby had a bruise on her left upper cheek. In response to the pediatrician's question regarding the origin of the bruise, the mother explained that the baby was learning to stand and walk and that the bruise may have been from her falling and striking an object.

Thereafter, ominously, the mother began noticing small bruises on the baby's back, along her hair line, and on her arms. Although the baby's mother thought that the baby may simply be easily bruised and that the bruises resulted from

the baby's crawling and attempting to walk, she contacted the pediatrician to be sure the baby did not have a "baby disease." On June 24, 1991, the pediatrician examined the baby and discovered that she had bruises along the vertebrae column of her lower back and a bruise along her right rib cage edge. Suspecting child abuse, the pediatrician informed the mother that under such circumstances he is required to report child abuse to the authorities. However, the mother became quite upset and insisted that the baby was learning to walk and that she was falling quite frequently thereby causing the injuries in question. Since the baby appeared healthy and happy in all other aspects, the pediatrician sent the baby home with her mother without reporting his suspicions to the authorities. Instead, the pediatrician decided to attempt to discover whether or not the baby had a blood disorder. Accordingly, he scheduled an appointment for the baby with a hematologist for July 11, 1991, for further medical procedures.

Prior to the scheduled appointment with the hematologist, on July 7, 1991, an incident occurred where the baby was rendered unconscious. The mother had briefly exited the living room where appellant was giving the baby her bottle and returned only moments later to find that the baby had stopped breathing and had become unconscious. The mother picked up her baby and instructed appellant to call 911. The baby regained consciousness a few minutes later, but the mother insisted on taking the baby to the emergency room at Children's Hospital to be examined. The examination revealed that the baby had an enlarged liver and spleen and had small bruises over her forehead, back and stomach which appeared to be of varying ages. Despite the baby's condition, the emergency personnel permitted the baby's mother and appellant to take the baby home, informing the mother that the baby merely experienced a "breath holding spell."

The mother kept the scheduled appointment with the hematologist on July 11, 1991, and a battery of tests were administered to the baby. The initial examination revealed no blood abnormalities. However, the hematologist noted bruising in unusual places, the possibility of a healing bone fracture or

lesion in the left tibia, a large red pinch mark on the baby's side and abnormal liver function. The hematologist sent the baby home with the mother and told the mother that she would be informed of the test results later.

In the days following the "breathing spell" incident, the mother continually observed and cared for the baby and she observed that the baby's health was normal during that period. However, one week later, on July 14, 1991, at approximately noon, mother and baby were in the living room area of their apartment. While the mother spoke on the telephone and the baby played on the floor in front of her, appellant entered the room and decided that it was time for the baby's nap. Appellant picked the baby up, took her into the bedroom and closed the door. Initially, the mother heard the baby crying but shortly thereafter she realized that the baby ceased crying. The mother ended her conversation and went to the bedroom to check on appellant and the baby. When the mother entered the bedroom, she found the baby in the crib convulsing and appellant standing beside the crib staring at the baby. Appellant said that the baby had been convulsing for approximately 20 seconds, yet he apparently made no effort to assist the baby himself or to seek help from the mother who was trained in infant cardio-pulmonary resuscitation. Paramedics who had been summoned to the apartment arrived and administered oxygen to the baby and she immediately came out of what appeared to be a seizure of some sort. The baby was then transported by ambulance to Children's Hospital where an examination revealed that her liver was still enlarged but smaller than the previous week. The baby was once again released from the hospital and the mother was instructed to return to the neurology clinic the following day for a battery of neurologic tests. The mother and baby returned to Children's Hospital the next day and the baby was admitted for four days during which her bruises healed and there were no additional seizure-like episodes. Specialists performed various examinations and no abnormalities were discovered and all the test findings were normal. Hence, the baby was released from the hospital.

After returning home from the hospital the baby appeared to be normal and healthy. However, on July 21, 1991, the mother went into the baby's bedroom and found her dead in her crib. The mother called the paramedics, but the baby showed no vital signs. The baby was gray and her tongue was swollen and protruding from her mouth. There were bruises on her upper body, arms, chest and shoulders. Rigor mortis had set in and the baby appeared to have been dead several hours. The autopsy, which was performed that day revealed that the baby had been dead for less than twelve hours. The external examination revealed fresh bruises on her chest, abdomen, left and right arms, and back, a hemorrhage around the pancreas and adrenal gland, a bruise on the right lower lobe of the lung, a bruise on the posterior side of the thymus gland, and a fracture of the sixth rib on the left side in the back which was a healing fracture which had been refractured. The head examination revealed a subdural hemorrhage. The cause of the victim's death was determined to be the result of a blunt force most likely caused by squeezing.

On August 11, 1991, appellant was arrested and charged with criminal homicide. Appellant described the events leading to the baby's death in a statement to the police. Appellant informed the police that the mother placed the baby in bed and went to bed herself while appellant continued watching television. Appellant explained that he inadvertently awakened the baby and then became frustrated when she would not stop crying. Appellant, worried that the infant's crying would awaken his wife and that she would be upset with him, held the baby tightly for approximately four minutes until she stopped moving. Appellant stated that he then returned the baby to her crib. Appellant explained that he could not sleep well because he knew that in the morning he would have to deal with the baby's death.

At trial, appellant testified that his statement to the police was inaccurate and the product of his fright and confusion. Appellant explained that he loved the baby very much and that he would never do anything to harm her. Appellant further testified that he never hit the baby, that he never

punched her, and that he never squeezed the baby violently. In describing the evening preceding the baby's death, appellant claimed that he went into her room at approximately 2:00 a.m. because he heard her crying. Appellant explained that he held the baby for approximately four minutes until she calmed down and then put her back into the crib. Appellant testified that he then went to bed and woke up the next morning at approximately 7:15 a.m. and told his wife that he walked by the baby's room and that she "did not look good." Appellant explained that the mother then went to the baby's room, picked her up from the crib and attempted to revive her but to no avail.

Following a jury trial, appellant was convicted of third degree murder.[1] The trial court denied post-trial motions and sentenced appellant to a term of eight (8) to sixteen (16) years imprisonment. The Superior Court affirmed appellant's judgment of sentence. This appeal followed.

Appellant claims that he is entitled to a new trial because the trial court failed to instruct the jury on what is often referred to as "heat of passion" voluntary manslaughter. The 1972 Crimes Code defines voluntary manslaughter as follows:

> **(a) General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed; or
>
> (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> **(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

1. 18 Pa.C.S. § 2502(c).

**(c) Grading.**—Voluntary manslaughter is a felony of the second degree.

18 Pa.C.S. § 2503.

Under the Crimes Code, a person is guilty of voluntary manslaughter if at the time of the killing he acted under a sudden and intense passion resulting from serious provocation by the victim. 18 Pa.C.S. § 2503(a); *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90, 95 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995). "Heat of passion" includes emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason. *Commonwealth v. Harris,* 472 Pa. 406, 408, 372 A.2d 757, 758–759 (1977). In the instant case, both appellant's statement and his testimony clearly demonstrate that he was not acting under "heat of passion" when he killed the baby nor was the killing the result of a "serious provocation" by the baby. Nevertheless, appellant requested that the trial court charge the jury on "heat of passion" voluntary manslaughter. Notwithstanding that the prosecution assented to the giving of such a charge, the trial court refused, holding that there was no evidence to support the theory that the killing was committed in the "heat of passion." We agree.

Nevertheless, we still must decide whether the law of this Commonwealth requires that a "heat of passion" voluntary manslaughter jury instruction be given in a homicide case, even where there is no supporting voluntary manslaughter evidence. Our analysis begins with *Commonwealth v. Jones,* 457 Pa. 563, 573–574, 319 A.2d 142, 148 (1974), *cert. denied,* 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974). In *Jones,* the defendant was charged and convicted of first degree criminal homicide under the Penal Code of 1939. At trial, Jones requested a "heat of passion" or a legal provocation voluntary manslaughter instruction notwithstanding that the defense conceded that there was no evidence to support such a verdict. The trial court refused to instruct the jury on voluntary manslaughter because the evidence failed to support it. On appeal, Mr. Justice Nix, now, Chief Justice Nix, explained for the equally divided Court that since the 1939

Penal Statute did not define the crimes of murder and voluntary manslaughter, but rather relied upon common law concepts, a defendant charged with criminal homicide is entitled to a voluntary manslaughter charge even in the absence of evidence of passion or provocation.[2] The opinion in support of affirmance reasoned that the giving of such a charge was

2. A trial judge was required to give such an instruction in the absence of such evidence because the 1939 Penal Code did not distinguish between murder and voluntary manslaughter. The 1939 Penal Code defined murder and voluntary manslaughter in pertinent part, as follows:

**Section 701. Murder of the First and Second Degree.**
—All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree....
Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict....
Whoever is convicted of the crime of murder of the second degree is guilty of a felony, and shall, for the first offense, be sentenced to undergo imprisonment by separate or solitary confinement not exceeding twenty (20) years, or fined not exceeding ten thousand dollars, or both, and for the second offense, shall undergo imprisonment for the period of his natural life.

**Section 703. Voluntary and Involuntary Manslaughter.**
—Whoever is convicted of voluntary manslaughter is guilty of a felony, and shall be sentenced to pay a fine not exceeding six thousand dollars ($6,000), and to undergo imprisonment, by separate or solitary confinement at labor or simple imprisonment, not exceeding twelve (12) years, and in the discretion of the court, to give security for good behavior during life, or for any less time, according to the nature and enormity of the offense....

Act of June 24, 1939, P.L. 872, §§ 701 and 703, 18 P.S. §§ 4701 and 4703.

In 1972, the Crimes Code was enacted which set forth the statutory definition of voluntary manslaughter. Criminal homicide is defined as follows:

**§ 2501. Criminal homicide**
**(a) Offense defined.**—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.
**(b) Classification.**—Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter.

18 Pa.C.S. § 2501.

intended to prevent the prosecution from failing in the event that an element of the crime of murder was not proven by the prosecution and it was further designed to empower the jury to extend mercy to an accused by finding a lesser degree of crime than that which is established by the evidence. *Id.* at 569, 319 A.2d at 146. Nevertheless, the Court did not grant relief to Jones. The Court found that Jones was not prejudiced by the trial court's refusal of the voluntary manslaughter instruction since the jury returned a first degree verdict rather than a second degree verdict which it could have returned.

Subsequently, in *Commonwealth v. Manning,* 477 Pa. 495, 384 A.2d 1197 (1978), this Court extended its holding in *Jones,* to criminal homicides brought under the Crimes Code of 1972. In *Manning,* the defendant was charged and convicted of two counts of first degree murder. Manning told police that he had quarreled with the male victim in his backyard. After the quarrel, Manning went into his house and retrieved a high powered rifle and inserted ammunition. Manning then went to his front porch and fired several shots in the direction of the back yard. Manning demanded that the male victim leave the premises and he threatened to kill him. The male victim then stepped from behind Manning's garage and Manning fired one shot at him, striking him in the chest and killing him. The victim's girlfriend then ran towards the decedent and Manning fired six shots at her, hitting her five times and killing her. Manning then killed the victim's dog, piled up the bodies and disappeared into the woods. At trial, Manning testified that he had consumed large quantities of various drugs during the time immediately preceding his killing of the victims. Manning further testified that he did not recall seeing anyone in the area, that he had no intention of shooting anyone, and that he had shot at two flying gargoyles and a snake. The trial court charged the jury on "heat of passion" voluntary manslaughter but refused to charge the jury on "unreasonable belief" voluntary manslaughter holding that the

evidence did not support it.[3] On appeal, this Court, relying on *Jones, supra,* reversed and held that whatever the nature of the evidence presented, a defendant charged with murder has an unconditional right on request to an instruction on the complete statutory definition of the offense of voluntary manslaughter. *Id.,* 477 Pa. at 499, 384 A.2d at 1199.

However, in *Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983), this Court overruled *Manning, supra.* In *Carter,* the defendant was convicted of third degree murder under the Crimes Code.[4] On appeal, Carter argued that trial counsel was ineffective for failing to object to the trial court's instruction on voluntary manslaughter since it failed to instruct the jury regarding "unreasonable belief" voluntary manslaughter. The *Carter* Court observed that *Jones* was unique as it was decided pursuant to the 1939 Penal Code which did not define the crimes of murder and voluntary manslaughter whereas *Manning* was decided pursuant to the 1972 Crimes Code, which did define murder and voluntary manslaughter.[5] Hence, this Court explained in *Carter* that its holding in *Manning* was erroneous because the Court there overlooked the change in statutory law when it relied on *Jones* to hold that a defendant charged with murder, has an unconditional right on request to an instruction on the complete statutory

3. Unreasonable belief voluntary manslaughter presupposes an intentional killing. Manning denied that he intentionally killed the victims, thus the trial court refused to charge the jury regarding unreasonable belief voluntary manslaughter.

4. The Crimes Code defines the degrees of murder as follows:

(a) **Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

(b) **Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

(c) **Murder of the third degree.**—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502.

5. The definition of voluntary manslaughter pursuant to the 1972 Crimes Code has remained unchanged and, of course, includes both heat of passion killings and unreasonable belief killings as cited earlier in footnote 2.

definition of voluntary manslaughter. Accordingly, the Court held that a trial court is not required to charge a jury regarding the unreasonable belief subsection of voluntary manslaughter unless evidence exists that would support such a verdict and that, to the extent that *Manning* indicates otherwise, it is overruled. *See Carter,* 502 Pa. at 435, 466 A.2d at 1328.[6]

Because *Carter* and several cases decided since *Jones* and *Manning* have consistently held that jury instructions regarding offenses and defenses are not warranted unless there is evidence to support such instructions,[7] and because panels of

6. The trial court did charge the jury regarding "heat of passion" voluntary manslaughter.

7. *Commonwealth v. Williams,* 537 Pa. 1, 30–31, 640 A.2d 1251, 1266 (1994) (trial counsel not ineffective for failing to request a voluntary and an involuntary manslaughter instruction where no evidence existed to support a verdict of either offense); *Commonwealth v. Bryant,* 524 Pa. 564, 574 A.2d 590 (1990) (trial court not required to instruct the jury on involuntary manslaughter where there was no evidence presented at trial to support a conviction for involuntary manslaughter); *Commonwealth v. Walker,* 491 Pa. 351, 421 A.2d 172 (1980) (trial court properly refused defendant's request for a jury instruction on involuntary manslaughter where the evidence would not reasonably support such a verdict); *Commonwealth v. White,* 490 Pa. 179, 415 A.2d 399 (1980) (trial court may charge on involuntary manslaughter only where evidence exists to support such a verdict); *Commonwealth v. Williams,* 490 Pa. 187, 415 A.2d 403 (1980) (in a murder prosecution, an involuntary manslaughter charge shall be given only when requested, and where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict); *Commonwealth v. Holmes,* 486 Pa. 415, 406 A.2d 510 (1979) (no instruction required for involuntary manslaughter charge where no evidence was presented which was capable of supporting an involuntary manslaughter verdict); *Commonwealth v. Thomas,* 482 Pa. 312, 393 A.2d 1122 (1978) (trial court did not err in refusing to charge jury on involuntary manslaughter where there was no evidence upon which to base an involuntary manslaughter verdict). *See also Commonwealth v. Harris,* 542 Pa. 134, 665 A.2d 1172 (1995) (no self-defense instruction required where the evidence does not support self-defense); *Commonwealth v. Roxberry,* 529 Pa. 160, 602 A.2d 826 (1992) (alibi instruction required only where there is a minimum or threshold quantum of evidence of physical separation); *Commonwealth v. Carpenter,* 533 Pa. 40, 617 A.2d 1263 (1992) (trial court required to charge jury on intoxication only where evidence demonstrates that defendant was overwhelmed or overpowered by alcohol); *Commonwealth v. Capitolo,* 508 Pa. 372, 498 A.2d 806 (1985) (defendant entitled to instruction on justification as defense to crime charged where evidence is offered in support of such); *Common-*

our Superior Court have reached different conclusions as to whether *Jones* still requires an instruction regardless of whether there exists evidence to support it,[8] we granted allocatur to resolve this confusion.

Today, consistent with *Carter,* we hold that a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. Therefore, only where an instruction is requested and only if the evidence supports "heat of passion" voluntary manslaughter, is an instruction thereon required. Therefore, this Court's decision in *Commonwealth v. Manning, supra,* which extended the holding in *Jones* to criminal homicides brought under the Crimes Code of 1972, is expressly overruled.[9] Instructions regarding matters which are not before the court or which are

*wealth v. Brown,* 491 Pa. 507, 421 A.2d 660 (1980) (jury charge on self-defense will be given upon request where jury would have basis for finding it); and *Commonwealth v. Lee,* 484 Pa. 335, 399 A.2d 104 (1979) (trial court did not err by refusing to give jury instruction on defense of abandonment where facts did not support such a defense).

8. For instance, in *Commonwealth v. Mignogna,* 401 Pa.Super. 188, 585 A.2d 1 (1990), *appeal denied,* 530 Pa. 660, 609 A.2d 167 (1992); *Commonwealth v. Mays,* 361 Pa.Super. 554, 523 A.2d 357 (1987), *appeal denied,* 516 Pa. 613, 531 A.2d 780 (1987); and *Commonwealth v. Griffin,* 357 Pa.Super. 308, 515 A.2d 1382 (1986), *appeal denied,* 515 Pa. 574, 527 A.2d 535 (1987), panels of the Superior Court recognized that *Carter* had seriously eroded the holding in *Jones, supra,* but nonetheless upheld the practice of allowing a heat of passion charge upon request, even in the absence of evidence to support it. Conversely, in *Commonwealth v. Hernandez,* 412 Pa.Super. 485, 603 A.2d 1039 (1992), *appeal denied,* 532 Pa. 662, 616 A.2d 983 (1992); *Commonwealth v. Haynes,* 395 Pa.Super. 322, 577 A.2d 564 (1990), *appeal denied,* 527 Pa. 598, 589 A.2d 689 (1991) and *Commonwealth v. Toledo,* 365 Pa.Super. 224, 529 A.2d 480 (1987), *appeal denied,* 517 Pa. 622, 538 A.2d 876 (1988), panels of the Superior Court interpreted *Carter* to apply to heat of passion voluntary manslaughter.

9. Though never expressly overruled, the holdings of both *Jones, supra,* and *Manning, supra* were seriously questioned in *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), where this Court noted that there was little or no vitality left to the practice regarding instructions on voluntary manslaughter where no evidence exists that would support such a verdict. *Frey,* 504 Pa. at 450, n. 10, 475 A.2d at 711, n. 10.

not supported by the evidence serve no purpose other than to confuse the jury.

Accordingly, the trial court properly refused to instruct the jury on "heat of passion" voluntary manslaughter where there was no evidence to support such a verdict.

The order of the Superior Court is affirmed.

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.