J-S30004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| PEDRO JUNIOR RODRIGUEZ | |
| Appellant | No. 896 EDA 2015 |

Appeal from the Judgment of Sentence March 3, 2015
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0005244-2013

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED APRIL 15, 2016**

Appellant, Pedro Junior Rodriguez, appeals from the judgment of sentence entered in the Lehigh County Court of Common Pleas, following his jury trial conviction for third-degree murder.[1]  We affirm.

The trial court opinion fully sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> DID THE TRIAL COURT ERR WHEN IT DENIED [APPELLANT'S] PRETRIAL MOTION TO SUPPRESS STATEMENTS MADE BY [APPELLANT] TO THE POLICE WHILE UNDER INTERROGATION AND ALLOWED THEM TO BE ENTERED AS EVIDENCE?
>
> DID THE TRIAL COURT ERR WHEN IT DENIED

---

[1] 18 Pa.C.S.A. § 2502(c).

[APPELLANT'S] REQUEST FOR A JURY CHARGE INSTRUCTING THE JURY THAT PROOF OF "HEAT OF PASSION" COULD REDUCE THE CHARGE OF CRIMINAL HOMICIDE TO THE LESSER OFFENSE OF VOLUNTARY MANSLAUGHTER?

(Appellant's Brief at 7).

We review the denial of a suppression motion as follows:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

[W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams*, 941 A.2d 14, 26-27 (Pa.Super. 2008) (*en banc*) (internal citations and quotation marks omitted).

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Baker*, 24 A.3d 1006, 1022 (Pa.Super. 2011) (quoting *Commonwealth v. Galvin*, 603 Pa. 625, 651, 985 A.2d 783, 798-99 (2009)).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable William E.

- 2 -

Ford, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed May 8, 2015, at 4-16) (finding: **(1)** during police interview, detectives said nothing improper to Appellant about his fiancée in light of information they had; detectives had evidence that Appellant made four phone calls to his fiancée immediately after attack on victim; shortly after those calls, Appellant and his fiancée drove for two hours to Selinsgrove; detectives properly questioned Appellant in attempt to determine respective involvement of Appellant and his fiancée in incident; detectives confronted Appellant with his fiancée's statement to police, which incriminated Appellant and conflicted with Appellant's initial version of events and assertions of innocence; detectives did not say Appellant's fiancée would be prosecuted; rather, detectives said they would call district attorney to discuss what charges, if any, should be brought against her because they could not exclude her as person involved in attack on victim; no evidence supports Appellant's claim that police induced him to confess by threatening to arrest his fiancée or any other family member; Appellant did not testify at suppression hearing as to what prompted him to confess; detectives' challenged statements and questions to Appellant regarding his fiancée could not reasonably be construed as coercive; **(2)** at trial, Appellant testified that he believed victim had stolen items from Appellant and his fiancée; Appellant went to victim's apartment to confront him day before

- 3 -

incident, but victim was not there; Appellant returned to victim's apartment on next day; Appellant said he was still upset but had "calmed down a lot" since previous night; Appellant testified that during argument with victim, victim quickly reached across his body with his right hand; victim was sitting on sofa at that point; Appellant did not know what victim was reaching for; Appellant claimed he panicked, pulled out knife, and began to slash victim; Appellant said he then tried to defuse tension but victim charged him; Appellant admitted he could see victim was not holding weapon; Appellant slashed and stabbed victim with knife several more times; Appellant's testimony provided basis for jury instruction on "imperfect self-defense" voluntary manslaughter; jury instruction on "heat of passion" voluntary manslaughter, however, was not justified; victim's repeated denial that he stole Appellant's property could not constitute adequate provocation necessary for "heat of passion" defense; further, Appellant did not testify that victim's agitated appearance or action of reaching across his body caused Appellant to lose all composure or to enter intense emotional state that obscured his reason; therefore, court properly denied Appellant's request for jury instruction on "heat of passion" voluntary manslaughter). Accordingly, we affirm on the basis of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2016

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH
OF PENNSYLVANIA                 :
                                :
                                :       No.    CP-39-CR-5244-2013
        v.                      :
                                :
                                :       (Superior Court No. 896 EDA 2015)
PEDRO JUNIOR RODRIGUEZ,         :
                                :
        Defendant/Appellant     :

\* \* \* \* \* \* \* \* \* \*

APPEARANCES:

Michael T. Edwards, Deputy District Attorney,
    on behalf of the Commonwealth

Michael E. Brunnabend, Assistant Public Defender,
    on behalf of Defendant/Appellant

\* \* \* \* \* \* \* \* \* \*

WILLIAM E. FORD, JUDGE

### Pa.R.A.P. 1925(a) OPINION

A jury found defendant/appellant, Pedro Junior Rodriguez, guilty of third-degree

murder for stabbing Robert Brandon to death. I sentenced appellant for the murder to a

term of state confinement. Appellant timely filed the current notice of appeal to the

Superior Court of Pennsylvania. For the reasons that follow, appellant's two contentions

of error lack merit so this appeal should be denied.

35

## Factual and Procedural History

At approximately 7:30 a.m. on Sunday, November 3, 2013, officers of the Allentown Police Department were dispatched to 25 South Eleventh Street in Allentown, Pennsylvania, to respond to a report that a male was bleeding from his neck. The first policeman to respond was Officer Christopher Hendricks. He found Robert Brandon, the homicide victim in this case, still bleeding and lying in a pool of blood in the roadway of South Eleventh Street.

Officer Hendricks accurately assessed that Mr. Brandon was *in extremis* with multiple stab wounds in his abdomen and back. He had a gaping, bleeding wound that extended almost from his left ear to his right ear. Officer Hendricks, who was medically trained, used heroic measures to keep Mr. Brandon alive at the scene and then in the ambulance. This included holding Mr. Brandon's neck structures together so he could breathe and bleed less. In the ambulance, Officer Hendricks asked Mr. Brandon his name to which he responded, "Robert." Officer Hendricks asked Mr. Brandon, "Who did this to you?" Mr. Brandon responded, "Pedro." The officer asked, "Does he live here?" The victim responded, "No." The victim was then taken by trauma personnel into the hospital. He died before arriving at the operating room.

Detectives Erik Landis and Thomas Anderson of the Allentown Police Department were assigned the investigation of Mr. Brandon's death. At the site of the stabbing, they saw blood throughout the first floor of 25 South Eleventh Street with a trail of blood to where Mr. Brandon was found in the roadway. From interviews at the scene, the detectives learned that Mr. Brandon lived with his brother, Robert Talley, at this address

2

and that "Pedro" was the appellant, Pedro Junior Rodriguez. They determined that appellant lived with his fiancée, Joelly Clemente, at 429 Lumber Street in Allentown. The detectives examined appellant's cell phone records and saw that appellant placed several calls to Ms. Clemente right after the attack on Mr. Brandon. The detectives found out that appellant and Ms. Clemente traveled to Selinsgrove, Pennsylvania, that same day shortly after the stabbing and their exchange of phone calls. Selinsgrove is located in Snyder County, more than a two-hour drive from Allentown.

Later in the afternoon of November 3, Detectives Landis and Anderson drove to Selinsgrove. They went to the Selinsgrove Police Department to meet with the local chief of police and to apprise him of their investigation. The detectives and the chief then drove to 202 West Snyder Street in Selinsgrove where appellant and Clemente were believed to be located. Both were there. The detectives asked appellant if he was willing to be interviewed about an incident that occurred in Allentown earlier that day. Appellant agreed to accompany the detectives to the Selinsgrove police station for an interview.

At the start of the interview, Detective Landis informed appellant of his *Miranda* rights. Appellant waived these rights and spoke with the detectives. The interview lasted approximately two-and-a-half hours. Appellant initially denied stabbing Mr. Brandon, but he later admitted it. Appellant was then taken into custody and charged by a complaint with the criminal homicide of Mr. Brandon.

On March 13, 2014, appellant filed an omnibus pre-trial motion which included a motion to suppress the statements he made to the detectives. I conducted a hearing on the motion on April 14, 2014, and I denied the motion by order with opinion dated July 23,

3

2014.

Appellant's jury trial began on January 5, 2015. At trial, appellant testified that he stabbed Mr. Brandon but he claimed extenuating circumstances. On January 9, 2015, the jury found appellant guilty of third-degree murder. On March 3, 2015, I sentenced appellant to not less than twenty years to not more than forty years of state confinement. Appellant filed a motion for reconsideration of sentence which I denied by order dated March 13, 2015.

Appellant filed the present appeal on March 24, 2015. In response to an earlier order, appellant filed a "Concise Statement of Matters Complained on Appeal" as required by Pa.R.A.P. 1925(b) (Concise Statement) on April 8, 2015. Appellant raises two issues in his Concise Statement.

## Discussion and Conclusions of Law

### Jury Charge on Voluntary Manslaughter

In Paragraph 1 of the Concise Statement, appellant argues:

> The Court erred by denying the defense request for a jury
> charge regarding the heat of passion and advising the jury
> of that basis for reducing the Criminal Homicide charge to
> a Voluntary Manslaughter. The defense believes that the
> evidence supported its request and that the jury should have
> been advised of that instruction.

"It has long been the rule in this Commonwealth that a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial." *Commonwealth v. White*, 490 Pa. 179, 182, 415 A.2d 399, 400 (1980) (citations omitted). This principle is based on the idea that the members of the jury are charged with

4

rendering a true verdict and providing extraneous and irrelevant instructions may confuse them or provide obstacles to carrying out their duty. *Id.* Therefore, a trial court should instruct a jury in a homicide case on heat of passion voluntary manslaughter only if there is evidence to support such a charge. *See Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284 (1998), and *Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668 (1996).

During the charge session at trial, defense counsel requested jury instructions for both heat of passion and imperfect self-defense voluntary manslaughter. I denied the request for a charge on heat of passion voluntary manslaughter because the trial evidence only supported an instruction on imperfect self-defense voluntary manslaughter. I instructed the jury on the latter, not the former.

"A person is guilty of 'heat of passion' voluntary manslaughter 'if at the time of the killing [he] reacted under a sudden and intense passion resulting from serious provocation by the victim.'" *Commonwealth v. Miller*, 605 Pa. 1, 20, 987 A.2d 638, 649-650 (2009) (quoting *Commonwealth v. Ragan*, 560 Pa. 106, 119, 743 A.2d 390, 396 (1999)). The "heat of passion" encompasses "emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason." *Commonwealth v. Browdie*, 543 Pa. at 344, 671 A.2d at 671.

> "Whether the provocation by the victim was sufficient to support a heat of passion defense is determined by an objective test: whether a reasonable man who was confronted with the provoking events would become 'impassioned to the extent that his mind was incapable of cool reflection.' " (citations omitted). Significantly, we have clarified that both passion and provocation must be established, and that "if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has

5

resumed its sway, the killing will be murder." (Citations omitted).

*Commonwealth v. Busanet*, 618 Pa. 1, 34, 54 A.2d 35, 55 (2012). The provocation must be capable of producing an emotional state of such intensity that it "obscure[s] temporarily the reason of the person affected." *Commonwealth v. Laich*, 566 Pa. 19, 27, 777 A.2d 1057, 1061 (2001) (quoting *Commonwealth v. McCusker*, 448 Pa. 382, 386, 292 A.2d 286, 288 n. 4 (1972)).

A trial court must make an initial determination whether sufficient evidence of serious provocation has been presented before it submits a manslaughter instruction to the jury. *Commonwealth v. Carr*, 398 Pa.Super. 306, 311, 580 A.2d 1362, 1365 (1990).

Under imperfect self-defense, "a homicide is reduced from murder to voluntary manslaughter if the defendant subjectively believed circumstances justifying the killing existed, but objective reality negates that existence." *Commonwealth v. Carter*, 502 Pa. 433, 442, 466 A.2d 1328, 1332 (1983).

> [A] claim of imperfect self-defense must satisfy all the requisites of justifiable self-defense (including that the defendant was not the aggressor and did not violate a duty to retreat [to] safety), with the exception that imperfect self-defense involves an unreasonable, rather than a reasonable, belief that deadly force was required to save the actor's life.

*Commonwealth v. Rivera*, 603 Pa. 340, 362, 983 A.2d 1211, 1224 (2009).

In arguing for jury instructions on both heat of passion and imperfect self-defense voluntary manslaughter, defense counsel could rely only on the trial testimony of appellant because there was no other testimony to support appellant's version of events. Appellant admitted that he stabbed the unarmed victim, but he claimed that the stabbing was done in

6

reaction to conduct by Mr. Brandon. (Appellant's testimony on the subject is found at N.T., 1/8/15, pp. 85-173.)

Appellant testified that he and Mr. Brandon worked together and became friends. Appellant claimed that he suspected Mr. Brandon of stealing about $200 worth of items from his truck in June of 2013. Despite that, between June and November of 2013, appellant and Mr. Brandon socialized at times at each other's apartments. On November 2, 2013, the day before the murder, appellant testified that Ms. Clemente told him that some of her jewelry was missing from the apartment that they shared on Lumber Street. Appellant said that he immediately suspected Mr. Brandon because he was the only guest that had been allowed in that apartment. Appellant walked to Mr. Brandon's apartment to confront him about the thefts but Mr. Brandon was not there. Appellant spoke with Robert Talley, the victim's brother. Mr. Talley told appellant that his own laptops and other items were missing from his Eleventh Street apartment. Appellant stated that this confirmed for him that Mr. Brandon had stolen the items from his truck and the jewelry from his residence.

Appellant returned to his apartment and discussed what Mr. Talley had told him with Ms. Clemente. That night, according to appellant, he could not sleep well (but he did sleep) because he was angry and disappointed with Mr. Brandon.

The next morning, Sunday, November 3, appellant and Ms. Clemente planned to travel to Selinsgrove where appellant was relocating to start a new job. Appellant again decided to confront Mr. Brandon. Appellant told Ms. Clemente he was stepping out to buy cigarettes. Instead, he walked to Mr. Brandon's apartment and arrived there at 7 a.m..

7

Appellant testified that he was still upset at this point but had "calmed down a lot" since the previous night. Appellant knocked on the back door of Mr. Brandon's apartment. Mr. Brandon unlocked the door and let appellant into the kitchen.

Appellant testified that he questioned Mr. Brandon about the stolen items. He told Mr. Brandon that he was disappointed but not upset. He just wanted his items returned. Mr. Brandon responded that he did not have the items. Appellant then followed the victim from the kitchen, down a hall and into the living room.

As appellant described it, Mr. Brandon sat down on a sofa in the living room. Appellant continued to ask about the missing items and Mr. Brandon continued to deny that he had them. The argument escalated. Appellant testified that he saw Mr. Brandon quickly reach with his right hand across his body to his left side. Appellant did not know what Mr. Brandon was reaching for, but he knew "It wasn't nothing good." Appellant did not testify that he believed the victim was reaching for a gun or other weapon. Appellant claimed he panicked and he was afraid.

Appellant testified that he remembered that he had a knife in his pocket so he charged Mr. Brandon, pulled out his knife and began slashing in the area where Mr. Brandon was reaching. After slashing Mr. Brandon, appellant stepped back to the hallway. Mr. Brandon stood up and cursed at appellant. Appellant claimed he tried to "calm the tension down." Appellant could see that Mr. Brandon was not holding any weapon. Mr. Brandon then charged appellant. Appellant stumbled backwards. When the two men came into contact, appellant slashed upwards with his knife at Mr. Brandon several times. Appellant then pushed Mr. Brandon away from him and ran out of the apartment.

8

Mr. Brandon had three stab wounds, two of which were lethal. He also had six cut wounds, two of which were lethal. While appellant admitted that he caused all of these wounds to Mr. Brandon, he did not testify when during the altercation the wounds were inflicted. Mr. Brandon did not possess a weapon. Defendant had no injuries. Defendant claimed he discarded the knife somewhere outside the Eleventh Street address. The police did not recover the knife despite thorough searches for it.

If the jury accepted appellant's testimony, the jury would have been justified in concluding that appellant honestly, but unreasonably, believed that Mr. Brandon was reaching for a weapon and that his life was in danger. Thus, it was proper to instruct the jury on imperfect self-defense voluntary manslaughter.

On the other hand, appellant's testimony did not provide a basis for instructing the jury on heat of passion voluntary manslaughter.

The first argument made by the defense for this instruction relates to appellant's belief that Mr. Brandon had stolen from him. Appellant testified that when he confronted Mr. Brandon about the stolen items, Mr. Brandon did not deny the thefts. Instead, Mr. Brandon said that he did not have the items. Mr. Brandon's repeatedly saying that he did not have the items, as opposed to denying that he stole the items, was the provocation that allegedly incited appellant to stab the victim. N.T., 1/9/15, p. 5. As a matter of law, this could not serve as adequate provocation for voluntary manslaughter. Supposed theft could not be sufficient cause to incite the passion of a reasonable person to kill a victim.

Pennsylvania courts have held that serious provocation implicating voluntary manslaughter exists where a victim threatens a defendant or a member of that defendant's

9

family with physical violence. *See Commonwealth v. Duffy*, 355 Pa.Super. 145, 512 A.2d 1253 (1986), and *Commonwealth v. Berry*, 461 Pa. 233, 336 A.2d 262 (1975). Conversely, a victim's causing a loss or destruction of a defendant's property has not been found to provide the serious provocation necessary to require an instruction on voluntary manslaughter. *See Commonwealth v. Sheppard*, 436 Pa.Super. 584, 648 A.2d 563 (1994).

Defense counsel also argued that appellant stabbed Mr. Brandon while he was in fear resulting from Mr. Brandon's appearing agitated and perhaps reaching for something on the sofa. N.T., 1/8/15, p. 180. This is the blending of counsel's heat of passion theory with his imperfect self-defense theory. Regardless, appellant's testimony did not support giving a heat of passion instruction on this basis. Appellant never testified that viewing Mr. Brandon reach with his left hand caused him to lose all composure or to enter an intense emotional state that obscured his reason. Appellant's testimony was the opposite. He testified that after he stabbed Mr. Brandon the first time on the sofa, he attempted to reason with Mr. Brandon and "calm the tension" before stabbing him again. By his own testimony, appellant was in control of his emotions and was not acting in the heat of passion during his assault on Mr. Brandon.

I properly denied the defense request that the jury be charged on heat of passion voluntary manslaughter.

Voluntariness of Appellant's Statement to Police

Paragraph 2 of appellant's Concise Statement reads: "The Court erred in failing to suppress [appellant's] statement made to the police which were (sic) induced by the actions of the interrogating officers when they threatened to arrest the [appellant's] family if the

10

[appellant] did not admit to involvement in the crime."

The interview of appellant was conducted almost exclusively by Detective Landis with Detective Anderson in attendance. The interview started at 5:00 p.m. on November 3 and it concluded at 7:30 p.m.. It was broken into three segments.

There was nothing that happened during the entire interview that could be construed by appellant as threatening or coercive regarding charges for appellant's children whose ages are unknown in the record of this case. Detective Landis did not point to anything that the children allegedly did wrong.

Appellant asserts only one reason that his confession during the third segment of the interview should have been deemed involuntary, namely, that the detectives threatened him with prosecuting Ms. Clemente unless he admitted the killing. This claim lacks merit. The detectives said nothing improper to appellant about Ms. Clemente in view of the information they had about her during the interview. Furthermore, the detectives did not say that there would be a prosecution of Ms. Clemente. Rather, they said they would call the district attorney to discuss what charges should be brought against Ms. Clemente when they could not exclude her from involvement in the attack on Mr. Brandon. As I now explain, the Commonwealth met its burden of proving that appellant's confession was voluntary.

The Supreme Court of Pennsylvania explained:

> When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether

11

> the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.
>
> . . .
>
> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Commonwealth v. Nester*, 551 Pa. 157, 162-163, 709 A.2d 879, 882 (1998) (internal citations omitted).

A defendant's confession to police is not involuntary *per se* merely because the defendant asserts that the confession was motivated by a desire to protect a family member from prosecution. *Commonwealth v. Smith*, 85 A.3d 530, 538 (Pa.Super. 2014). Where a defendant asserts such a claim, it only serves as "evidence which could be considered by the trial court in determining whether the accused's will had been overborne." *Commonwealth v. Fleck*, 324 Pa.Super. 227, 233, 471 A.2d 547, 550 (1984). *See also Commonwealth v. Ozovek*, 270 Pa.Super. 468, 471, 411 A.2d 814, 815 (1979). ("Appellant's contention that he confessed out of fear that his wife might be implicated would not negate, as a matter of law, voluntariness[;] it is simply additional evidence which the court is free to believe or disbelieve.").

There is no evidence to support appellant's claim that the police induced him to confess by threatening to arrest his fiancée or any other family members. Appellant did

12

not testify that police statements induced him to confess and there is no other evidence of what caused him to confess. This allegation of error should be dismissed for this reason. I turn to the content of the interview which reveals that there was nothing *per se* improper about the statements by the detectives to appellant.

The first segment of the interview lasted from 5:00 p.m. to 6:08 p.m.. (The transcript of the first segment is Exhibit C-2(a).) During this segment, the police had not yet interviewed Joelly Clemente, appellant's fiancée. At the start of this segment, the detectives knew through appellant's phone records that he and Ms. Clemente had four phone conversations on this Sunday morning right after the stabbing of the victim. N.T., 4/14/14, p. 61. The detectives also knew that, right after the calls, appellant and Ms. Clemente made the drive to Selinsgrove. N.T., 4/14/14, pp. 59-60, 71-73. The detectives already suspected appellant of the stabbing based upon the victim's dying declaration that Pedro stabbed him. With the cell phone records and the drive to Selinsgrove, they were trying to figure out Ms. Clemente's exact involvement.

Detective Landis stated a number of things about her during the first segment. He told appellant that he was "not able to clear her" (Exhibit C-2(a), pp. 44-45; N.T., 4/14/14, p. 59); maybe appellant and Ms. Clemente would "both go down for it" (Exhibit C-2(a), p. 48); "Right now, I'm thinking you and your wife (Ms. Clemente) came up with this plan to . . . stab this guy" (Exhibit C-2(a), p. 52); and "This does not bode well for you or your wife right now." Exhibit C-2(a), p. 71.

Without having conducted an interview of Ms. Clemente, the detectives properly tried to explore with appellant during the first segment the extent of her involvement in his

13

activities that day. As Detective Landis testified at the suppression hearing, "At that point, I was not sure what her involvement was in the homicide, and we would have arrested her if the investigation led down that way." N.T., 4/14/14, p. 60. All the subjects that I related in the immediately preceding paragraph were within the bounds of proper interrogation in light of what the detectives knew. None of these statements was coercive.

The second segment of the interview began at 6:21 p.m.. Between the first segment and the second segment, Detective Landis drove back to 202 West Snyder Street in Selinsgrove, interviewed Joelly Clemente for the first time, and then drove her to the Selinsgrove police station. She stayed in a waiting area while Detective Landis went back to do the second segment of the interview with the appellant.

Joelly Clemente's statement to Detective Landis was materially different from what appellant told Detective Landis during the first segment of the interview. Landis confronted appellant with the conflicting information which contained matters that incriminated the appellant in the killing. When appellant insisted that his version of events was accurate and denied the various things said by Ms. Clemente, Detective Landis asked appellant, "Do you want me to arrest her? Do you want me to arrest your fiancée?" Appellant responded, "You don't have anything to arrest my wife for." Detective Anderson answered, "False report." Detective Landis then recounted some matters that could be incriminating against Ms. Clemente and he stated, "Who else do you live in the house with? Your kids, or your, your fiancée? Shall I hit one of them up?" Exhibit C-2(b), pp. 8-9. Appellant still insisted that his version of events claiming innocence was accurate. The second segment of the interview ended at 6:38 p.m.. Detective Landis left

14

the interview room and separately conducted a taped interview with Joelly Clemente. He returned to the interview room for the third and final segment of the interview with appellant.

The beginning time for the third segment of the interview is not stated on the transcript but it began at some point after 6:38 p.m. and after Detective Landis had the taped interview with Ms. Clemente. The transcript indicates it ended at 7:30 p.m.. Present during the third segment of the interview were the two detectives, Ms. Clemente, and appellant.

In the third segment, Detective Landis once again confronted appellant with the statements by Mr. Clemente that conflicted with his statements. Appellant continued to insist that he was not with the victim on November 3. After several denials, Detective Landis stated: "Get her out of here. . . . [T]he District Attorney already approved the charge against him. I'm not going to, do you want to stay for another three hours (it had actually been two hours) and have him sit here and calls um his fiancée a liar and everybody's lying? What we'll, we'll call about charges for everybody and, we'll, we'll be done with it. . . . What do you think, Tom?" Exhibit C-2(c), p. 9. After other statements by the detectives, appellant for the first time explained the alleged theft from his car and what appellant's brother allegedly told him about thefts that he suffered. Appellant said nothing about a theft of jewelry from his apartment. Appellant then gave an incriminating version of events whereby he admitted that he went to the victim's apartment and stabbed him.

Detective Landis's statement to appellant that he would "call about charges for

15

everybody" was not a threat that charges would be brought against Ms. Clemente. Rather, it was an indication that he would make a call to see what charges were appropriate. Appellant already knew that the detectives were in contact with the district attorney. They had discussed the district attorney earlier in the interview. See, for example, Exhibit C-2(a), p. 44.

In summary, the evidence does not give any hint as to why appellant confessed to stabbing the victim. It would be speculation to conclude that he confessed because of threats or perceived threats made by the detectives. Some of Detective Landis's statements which appellant argues were coercive arose in the context of proper questioning to try to determine the respective involvement of appellant and his fiancée who were together immediately before and after the stabbing. Detective Landis's other statements and questions to appellant about Ms. Clemente that are challenged in this appeal could not reasonably be construed as coercive.

For all of these reasons, there is no merit to the two contentions on appeal. The appeal should be denied.

May 8, 2015

WILLIAM E. FORD, JUDGE

16