J-A28039-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LARRY BENEFIELD FASON | : | |
| | : | |
| Appellant | : | No. 255 WDA 2020 |

Appeal from the Judgment of Sentence Entered September 17, 2019
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0000168-2018

BEFORE: OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: FILED JANUARY 06, 2021

Larry Benefield Fason (Appellant) appeals from the judgment of sentence entered in the Cambria County Court of Common Pleas following his jury conviction of first-degree murder and aggravated assault.[1] Appellant challenges both the sufficiency and weight of the evidence supporting his convictions, the trial court's failure to give a requested jury instruction, and a purported Brady[2] violation. We affirm.

The evidence presented at Appellant's jury trial established the following. On November 5, 2017, Johnstown Police Department officers and detectives were dispatched to the area of Bell Place and Messenger Street in Johnstown, Pennsylvania, after a report of a deceased body. N.T., 7/16/19,

_____

[1] 18 Pa.C.S. §§ 2502(a), 2702(a)(1).

[2] Brady v. Maryland, 373 U.S. 83 (1963).

at 74-75. When they arrived on the scene, they observed a deceased female lying in an apartment complex's trash receptacle area. Id. at 76. The deceased, later identified as Angela Lunn (Victim), a known acquaintance of Appellant, was partially clothed and had multiple contusions on her face and head. Id. at 89; N.T., 7/17/19, at 56.

Upon investigation, detectives noticed droplets of blood "leading from [Victim] up to the staircase to the rear of an apartment complex." N.T., 7/16/19, at 78. The blood trail led to a third floor apartment, where Appellant resided. Id. Appellant allowed police to enter the apartment to remove some of Victim's personal belongings. Id. at 80. Once inside, police immediately were "hit with a very strong smell of cleaning products; ammonia, like Clorox type smell." N.T., 7/17/19, at 59. The police also noticed blood stains around the kitchen sink and droplets of blood on the floor, which appeared "to be the same blood trail leading out the door." N.T., 7/16/19, at 81.

Police obtained a "body warrant" for Appellant, seeking photographs of his body, as well as samples of his blood, DNA samples, pubic hair, hair follicles, and fingernail clippings. Id. at 94. Appellant was transported to a local hospital where a Sexual Assault Nurse Examiner (SANE) examined Appellant and found blood on his finger, right foot, left toes, and underneath his left foot toenails. Id. at 97-100. The officers also obtained a search warrant for Appellant's apartment, where they recovered a "jug" of ammonia and a "jug" of detergent from the kitchen, and a tire iron, which was sticking

out of a water jug in the master bedroom. Id. at 96; N.T., 7/17/19, at 44, 47.

Upon noticing a surveillance camera facing the trash bin area, Detective Sergeant Corey Adams contacted the manager of the Elks Lodge to view the video beginning at midnight the night before. See N.T., 7/16/19, at 122-23. Because he did not have a flash drive available, Detective Sergeant Adams recorded the relevant portion of the video with his cell phone. Id. at 127. The detective returned to the Lodge the next day, and used a flash drive to download the surveillance video from the hours of 4:00 am to 7:00 pm. on November 5, 2017. Id. at 127-28. He then deleted the video on his cell phone. Id. The detective explained that the recording does not provide "one continuous video," but rather "chunks it into clips" so that "[s]ometimes [the recording is] missing a couple of seconds[.]" Id. at 129. The recording, which was played for the jury at trial, showed Victim arrive at the apartment complex at 4:15 a.m. on November 5th. See id. at 131-32. At approximately 5:30 a.m., Appellant could be seen placing two "shopping bags" inside a dumpster. See id. at 132-33. An hour later, the video showed Appellant positioning Victim's body in the trash bin area before returning to his apartment. See id. at 133-36. Although eight seconds were omitted from the video clip played for the jury, Detective Sergeant Adams testified that he viewed the original

video, and "nothing . . . happens in those eight seconds."[3]  Id. at 136.  The detective later retrieved the shopping bags from the dumpster, and discovered "numerous rags and towels soaked with blood, clumps of hair, . . . a pillowcase saturated in blood, and other pieces of garbage."  Id. at 142.

Police detained Appellant for questioning and, that same day, he provided three separate statements to Detective Bradley Christ and Detective Sergeant Adams.[4]  See N.T., 7/17/19, at 64, 66-67, 70, 74-75.  In his first statement, Appellant told the detectives Victim arrived at his house "beat up." N.T., 7/17/19, at 69.  He claimed she was "going to go to the hospital," so he "helped clean her up and then she walked out the back door."  Id.  After about an hour and a half break, the detectives spoke with Appellant again, and told him they had reviewed surveillance video of the scene, which showed him taking "garbage bags to the dumpster and bringing [Victim's] body out."  Id. at 70, 72.  In his second statement, Appellant again claimed Victim knocked on his door, "but this time he [stated] she was attacking him" and began "trashing his apartment."  Id. at 72.  During the altercation, Appellant claimed he had to "push her," and when he did so, "she fell in the hallway and hit her

_____

[3] During cross-examination of Detective Sergeant Adams, Appellant pointed out that there were other segments missing from the flash drive recording. See N.T., 7/16/19, at 154-58.  The detective responded that he could not be sure "those seconds were still on the video" he had recorded, and later deleted from his cell phone.  Id. at 158.

[4] Detective Christ was the lead detective in the interview.  See N.T., 7/16/19, at 126.  He provided Appellant with Miranda warnings.  N.T., 7/17/19, at 65-66.  See Miranda v. Arizona, 384 U.S. 436 (1966).

head[.]" Id. at 73. Appellant stated he followed her out of his apartment, where she collapsed on the bottom step. Id. Appellant maintained he then "picked her up and set her down in the garbage [but] she was still verbally speaking to him at that time." Id.

During another break, the detectives learned Victim sustained "some pretty substantial injuries [that were not] really lining up with" Appellant's prior statements. N.T., 7/17/19, at 74-75. Appellant then provided a third statement police, claiming:

> [Victim] came to his door, knocked. He was sleeping. He then let her in. She comes in, she smoked some dope, and she gets mad with [Appellant] because he wouldn't give her any money. He tells her to leave. [Victim] starts shoving and fighting with [him] again. He advises that he pushes her and she falls and hits her head in the hallway. He tells her again she has to leave. They walk . . . down the back steps together. He's [ ] in front of her. She collapses at the bottom so he lifts her up and tell her to go home. And . . . he was very adamant that [Victim] was clearly speaking English to him when he ultimately left her in that garbage receptacle.

Id. at 77. However, after the detectives confronted Appellant with the extent of Victim's injuries, which would have left her unable to leave his apartment on her own, Appellant commented: "I just snapped the fuck out." Id. He then told detectives for the first time that Victim fell from the third floor to the second floor, and "was pretending she couldn't get up[.]" Id. at 78. Appellant claimed he "grabbed her by the ankles and drug her down the other set of steps to the landing[.]" Id. He consistently maintained that Victim was alive and speaking when he left her near the trash receptacle. See id. at 79.

The trial court summarized the testimony of forensic pathologist Dr. Kevin Whaley regarding Victim's injuries as follows:

[Dr.] Whaley testified that [Victim] suffered numerous defensive and blunt force traumas that resulted in a variety of injuries and that three of those injuries would have been fatal with one being immediately fatal.

[Dr.] Whaley testified that [Victim's] injuries from the blunt force trauma included: a fracture to her mandible; a right and left basilar skull fracture; diffuse subgaleal hemorrhaging, where blood pools under the scalp; [subarachnoid] hemorrhaging where blood pools around the brain; cerebrospinal fluid leaking from the left ear canal through the left side basilar fracture across the petrous ridge; a green stick fracture to her right arm's ulna; a comminuted fracture of her right wrist bones; a fracture to the left arm's ulna bone; fractures to the front and sides of her left ribs numbers 3-7; a punctured left upper lung lobe resulting from a broken rib entering the lung; fractures to the front and sides of her right ribs numbers 2 and 6-10; her right ear being partially torn off; a lacerated spleen resulting from a broken rib piercing the organ; vaginal and rectal tearing; her left ear being damaged; hair torn from the scalp; and multiple abrasions, lacerations and bruises over her body. [Dr.] Whaley explained that [Victim's] injuries to her arms were consistent with defensive injuries that result when a person attempts to shield the head or body with their forearms.

[Dr.] Whaley testified that the bruising on [Victim's] buttocks, chest, abdomen, thighs, arms, and chin suggested it had been caused by a weapon since the bruising showed a tram track pattern. . . . Based on the bruises here [Dr.] Whaley concluded [Victim] had been struck repeatedly and with significant force by a long and narrow diameter object, such as a rod or board, on her head, chest, abdomen, arms, legs, buttocks, and chin. . . .

[Dr.] Whaley explained, that of the injuries [Victim] sustained three would be fatal with one resulting in immediate death. [Dr.] Whaley noted that both the punctured lung and lacerated spleen would have resulted in [Victim's] death unless immediate medical aid was provided. He noted that there was little blood loss from [Victim's] lung or spleen injury into the body cavity indicating that the injuries occurred immediately prior to or

after [Victim's] death when her blood pressure was minimal to nonexistent. [Dr.] Whaley explained that a person with a left side basilar fracture like [Victim's] would be able to survive for a period of time without medical attention but would eventually die without aid[.] He explained that a similar right side basilar fracture would be "most immediately lethal" as it would result in damage to the brain stem resulting in the shutdown of a person's autonomic functions such as heart rate and respiration. [Dr.] Whaley testified that it would take a significant blow to cause such a right side basilar fracture as the bone in that area is the thickest in the body. He opined that based upon the autopsy[,] it was likely caused by the blow to [Victim's] chin with the force resulting in the fractured jaw and traveling through the skull to cause the two basilar fractures and injury to the brain stem. . . . Finally, he opined that such a right side basilar fracture could not be caused by a simple fall or a normal fall down stairs.

Trial Ct. Op., 1/27/20, at 8-10.

Forensic testing revealed one hair fragment, but no blood on tire iron recovered from Appellant's apartment. See N.T., 7/17/19, at 148. With regard to the items sent for DNA testing, Appellant's DNA matched DNA found under the nails of Victim's hands. See Trial Ct. Op., 1/27/20, at 13. Victim's DNA matched the blood sample recovered from Appellant's left toes and boxer shorts, as well as various blood samples recovered from Appellant's apartment. Id. Moreover, "DNA from the four human hairs recovered from the clumps located in the dumpster contained one DNA profile that was a match to [Victim]." Id.

Appellant testified to the following in his own defense at trial. In the early morning hours of November 5, 2017, Victim came to his apartment with "bruises on her face, . . . [h]er lip was busted[, and s]he was leaking blood from her mouth." N.T., 7/18/19, at 52. Victim asked to use his bathroom,

and borrowed some towels so she could "wash[ ] up." Id. at 52-53. The two then smoked "weed" and "crack cocaine." Id. at 54. Appellant started to get "piss[ed] off" when Victim neglected to use an ashtray, and let the ashes from her cigarettes fall on the floor. Id. at 55. As he attempted to sweep up the ashes, he and Victim had words, and she bit his finger. Id. at 57. At that point, Appellant pushed her "kind of rough." Id. Appellant explained: "She came back — she like had her head on my chest, . . . and then I pushed her off me again a little harder[, and] she fell and hurt herself on the wall[.]" Id. He told the detectives that he "just F-ing snapped out" because he was angry at Victim for messing up his apartment. Id. at 58. Appellant then put the bloody rags Victim used to clean herself in a garbage bag, and took them to the dumpster. Id. at 58-59. He also began cleaning the blood spots throughout the apartment with disinfectant. Id. Shortly thereafter, Appellant discovered Victim "broke [his] weed plant[,]" at which point, he told her she "really [had] to go." Id. at 60. As Victim started down the steps, "[s]he got her feet messed up on the top of the step, and . . . fell backwards" to the second floor landing. Id. at 61. Appellant helped her up, and as she was holding his arm for support, she lost her grip, and fell "straight down" the rest of the steps, and struck her head on a pillar. Id. at 62. Victim got up and walked a few steps before collapsing. Id. at 63. Appellant admitted he then dragged her to the dumpster area before returning to his apartment. Id at 64-65. He claimed he never meant to hurt her, and he "thought she was okay" because she was still mumbling when he left her. See id. at 64-65, 67.

On cross-examination, Appellant stated he "told a lot of pieces of lies" to the police because he was scared and "in shock" because they had just gotten him out of bed and told him Victim was dead. N.T., 7/18/19, at 69. He also claimed he was afraid the police would charge him with a crime simply because he is black and Victim was white. Id. at 79, 88-89.

The Commonwealth presented one rebuttal witness, biochemical engineer and accident reconstructionist, Dr. Andrew Rentschler, who opined the basilar skull fracture and other injuries Victim sustained were "inconsistent with a backward fall down the steps[.]" See N.T., 7/18/19, at 123. See also id. at 115 (explaining Victim did not have "any depressed or comminuted or splintered-type fractures to her skull [that] you would expect with enough force striking the skull" to cause the basilar skull fracture). Dr. Rentschler testified his opinion would not change even if Victim had been pushed down the steps. See id. at 126-28.

Prior to trial, Appellant filed a motion to suppress the video surveillance footage from the Elks Lodge because the "gaps" in the footage included "missing video that [was] critical to [the] defense[.]"[5] Trial Ct. Op., 7/11/19, at 3. The court conducted a suppression hearing on July 5, 2019, and denied Appellant's motion by order entered July 11th. The case proceeded to a jury trial, and on July 19, 2019, the jury convicted Appellant of first degree murder

_____

[5] Appellant's motion is not docketed, nor included in the certified record.

and aggravated assault. On September 17, 2019, the trial court imposed a mandatory term of life imprisonment.

Appellant filed a timely post-sentence motion on September 27, 2019, followed by an amended motion on January 8, 2020. The court denied the motions on January 27th, and this timely appeal follows.[6]

Appellant presents the following four issues for our review:

1. Did the trial court err in denying . . . Appellant's Motion for Judgment of Acquittal based on a challenge to the sufficiency of the evidence?

2. Did the trial court err in denying . . . Appellant's Motion for a New Trial based on a challenge to the weight of the evidence?

3. Did the trial court err in denying . . . Appellant's Motion for a New Trial based on the [c]ourt's refusal to instruct the jury on voluntary and involuntary manslaughter?

4. Did the trial court err in denying . . . Appellant's Motion to Suppress Evidence?

Appellant's Brief at 3.

In his first issue, Appellant challenges the sufficiency of the evidence supporting his conviction of first-degree murder.[7]

In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. We must also bear in mind that:

_____

[6] Appellant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.

[7] Appellant presents no argument concerning his aggravated assault conviction.

> the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.

Commonwealth v. Chmiel, 889 A.2d 501, 516–17 (Pa. 2005) (citations omitted), cert. denied, 549 U.S. 848 (2006).

A conviction of first-degree murder requires the Commonwealth to prove beyond a reasonable doubt "a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill." Commonwealth v. Houser, 18 A.3d 1128, 1133 (Pa. 2011). See 18 Pa.C.S. § 2502(a). Both a specific intent to kill and malice may be inferred when the defendant uses a deadly weapon on a vital part of the victim's body. Houser, 18 A.3d at 1133-34 (citations omitted). Furthermore, we note "proof of motive is not necessary for a conviction of first-degree murder[.]" Chmiel, 889 A.2d at 517.

In the present case, Appellant contends "there is nothing in the record from which the jury could infer that [Appellant] had a conscious purpose to bring about [Victim's] death." Appellant's Brief at 7. Rather, he maintains "the evidence . . . indicates that [Victim] had an open invitation to [Appellant's] home, and that [Appellant] enjoyed her company." Id. While Appellant admits the two argued on the night of Victim's death, he insists there was "nothing" in the record to "suggest he was capable of wanting to kill his friend over a petty argument" and the Commonwealth presented no

evidence of motive. See id. at 7-8. Furthermore, he points to the county coroner's testimony at his preliminary hearing which suggested some of the bruises on Victim's body may have been sustained "more than 72 hours before she was photographed by the coroner." Id. at 10. With regard to the use of a deadly weapon, Appellant notes that while the prosecutor, in her closing argument, referred to the tire iron found in his apartment, there was no blood or DNA recovered from that object. Id. Thus, the jury had to "engage in pure speculation as to whether the tire iron was used as a weapon." Id. Accordingly, Appellant insists the evidence was insufficient to support his conviction of first-degree murder.

The trial court disposed of Appellant's sufficiency claim as follows:

> Here the evidence establishes that: [Victim] arrived at [Appellant's] apartment alive; that only she and [Appellant] were present; [Victim] was found in a trash shelter in the alley behind [Appellant's] apartment dead; [Victim's] death resulted from multiple blunt force traumas that inflicted numerous serious injuries; [Victim] suffered three injuries any of which would have been fatal; [Victim's] injuries were the result of significant force used over multiple parts of her body; video showed [Appellant] carrying [Victim's] body into the alley and placing it in the trash shelter; video showed [Appellant] disposing of bags containing [Victim's] hair; [Victim's] blood was found in [Appellant's] apartment; and [Victim's] blood or DNA was found on [Appellant's] body, under his nails, and on his clothing. In addition the jury heard testimony detailing how [Appellant] provided three separate stories to [police] concerning what happened between him and [Victim] on the morning of her death.
>
> Viewed in its totality the evidence is sufficient to establish the element of specific intent to kill. Dr. Whaley determined the most immediate cause of [Victim's] death was the blow to her jaw resulting in a broken jaw and a right side basilar fracture that impacted her brain stem. Both [Drs.] Whaley and Rentschler

testified that such a blow would have required significant force to result in such injuries. [Victim] did not suffer a single injury that resulted in her death as [Dr.] Whaley testified she suffered from multiple other injuries include two additional fatal injuries.

Dr. Whaley testified that [Victim] suffered from multiple blunt force traumas across her body[.] He noted there was little blood loss from [Victim's] lung or spleen injury into the body cavity indicating that the injuries occurred immediately prior to or just after [her] death when her blood pressure was minimal to nonexistent. [Dr.] Whaley further explained that [Victim's] injuries to her arms were consistent with defensive injuries that result when a person attempts to shield the head or body with their forearms to ward off an attacker.

The nature and extent of [Victim's] extreme injuries would allow a jury to find that [Appellant] acted with the specific intent to kill. . . .

Trial Ct. Op., 1/27/20, at 20-21.

Our review of the record reveals no basis to disagree with the trial court. Appellant's argument focuses primarily on the lack of motive for the killing, and a purported lack of evidence demonstrating he possessed the requisite intent to kill Victim. However, as noted supra, the Commonwealth is not required to prove motive in a first-degree murder prosecution, and the intent to kill may be inferred from the use of a deadly weapon on a vital part of the victim's body. See Houser, 18 A.3d at 1133-34; Chmiel, 889 A.2d at 517. Based upon the evidence presented at trial, the jury could have inferred Appellant developed the intent to kill Victim during their argument. Indeed, after changing his story several times, Appellant admitted to the detectives that he "just snapped the fuck out." N.T., 7/17/19, at 77. See Commonwealth v. Jordan, 65 A.3d 318, 323 (Pa. 2013) ("The law does not require a lengthy period of premeditation; indeed, the design to kill can be

- 13 -

formulated in a fraction of a second."), cert. denied, 571 U.S. 1204 (2014). Furthermore, as the trial court explained, both Drs. Whaley and Rentschler opined that the "blow [which caused Victim's brain stem injury] would have required significant force[,]" and her injuries were not consistent with Appellant's claim that Victim fell down the steps. Trial Ct. Op., 1/27/20, at 20-21. See also N.T., 7/17/19, at 182, 197; N.T., 7/18/19, at 114, 117, 120-23, 126-28. The jury was free to determine the credibility of the witnesses, including Appellant, and "believe all, part, or none of the evidence." See Chmiel, 889 A.2d at 516–17 (citation omitted).

We note that Appellant emphasizes the testimony of the county corner at the preliminary hearing, which indicated some of Victim's bruises were more than 72 hours old. See Appellant's Brief at 10; N.T. Preliminary H'rg, 1/26/18, at 62. However, Appellant ignores the coroner's further testimony that Victim had "over a hundred bruises to her body" and that some of the bruising was "fresh." Id. at 63. Moreover, Dr. Whaley testified at trial that Victim suffered "a significant number of blunt force injuries, three of which would [have been] lethal[.]" N.T., 7/17/19, at 163. Thus, the fact Victim may have also had some older bruising is not dispositive.

With regard to the tire iron, we note the Commonwealth is not required to produce or identify a murder weapon in order to secure a conviction of murder. Nevertheless, Dr. Whaley testified that based upon his observation of Victim's injuries, she was struck forcefully with an object. See N.T., 7/17/19, at 165, 172-73, 177-78, 197 (identifying "pale area" in center of

bruise under chin where "object actually hit" and "tram-track patterns" in bruising on buttocks, arms and thighs). Because we conclude the evidence was sufficient for the jury to find beyond a reasonable doubt that Appellant murdered Victim with the specific intent to kill, Appellant's first claim fails.

Next, Appellant challenges the weight of the evidence supporting his murder conviction.[8] Our review of a weight challenge is distinct from a sufficiency challenge:

> When a trial court evaluates a weight of the evidence claim, the trial court may award relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." On appeal, the inquiry differs. When it considers a weight claim, an appellate court must review the trial court's exercise of discretion. "A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." We do not contemplate the underlying question of whether the verdict actually was against the weight of the evidence. Rather, we evaluate the trial court's decision of that issue, and we do so under an abuse of discretion standard.

Commonwealth v. Clemons, 200 A.3d 441, 463–64 (Pa. 2019) (citation omitted and emphasis added), cert. denied, 140 S. Ct. 176 (U.S. 2019).

In the present case, Appellant contends that if his "actions were the cause of [Victim's] death, the death was unintentional." Appellant's Brief at 11. His sole argument consists of a list of factors, which he claims "weigh[ ]

_____

[8] Appellant properly preserved his weight claim in his timely filed post-sentence motion. See Pa.R.Crim.P. 607(A)(3).

against a finding of the specific intent to kill[,]" including: (1) no motive was presented by the Commonwealth or developed during trial; (2) Appellant "is not known to have violent tendencies;" (3) Appellant and Victim were friends, and Appellant's teenaged daughters also considered Victim a friend; and (4) Appellant did not "try to hide his actions" from the surveillance camera, nor flee the scene, both of which tend to show he "did not believe his actions were unlawful." Id. Indeed, Appellant insists a conviction of "first-degree murder where the accursed doesn't even have a motive to kill should shock the Court's sense of justice." Id. at 12.

The trial court addressed Appellant's weight claim as follows:

> [T]he jury was presented with substantial evidence related to the nature and extent of [Victim's] injuries. In addition evidence showed that she and [Appellant] were alone in the period immediately before her death and testimony established that her injuries were inconsistent with the version of events offered by [Appellant]. The jury was free to choose which evidence to accept and their verdict indicates that they did not credit [Appellant's] version of events or explanation of how [Victim] was injured[,] but chose to accept the uncontradicted scientific evidence concerning the causes of [Victim's] injuries. Their verdict is consistent with the evidence presented and does not shock the [c]ourt's sense of justice such that the verdict must be set aside.

Trial Ct. Op., 1/27/20, at 24.

Appellant fails to establish an abuse of discretion by the trial court. See Clemons, 200 A.3d at 464. Rather, he simply presents evidence favorable to his defense, and ignores the medical, scientific, and video evidence supporting the Commonwealth's case. No relief is warranted.

- 16 -

Appellant next contends the trial court erred when it failed to instruct the jury on voluntary and involuntary manslaughter.  Appellant's Brief at 12.  Our review of a challenge to the trial court's jury instructions is well-settled: "[W]e review the charge as a whole to ensure it was a fair and complete statement of the law."  Commonwealth v. Spell, 28 A.3d 1274, 1281 (Pa. 2011) (citation omitted).

> Defendants are generally entitled to instructions that they have requested and that are supported by the evidence. Commonwealth v. Markman, 916 A.2d 586, 607 (2007); Commonwealth v. DeMarco, 809 A.2d 256, 261 (2002) ("Where a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record."); Commonwealth v. Browdie, 671 A.2d 668, 673–74 (1996) ("[W]e hold that a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict.").  We have explained that the reason for this rule is that "instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict."  Commonwealth v. Taylor, 876 A.2d 916, 925–26 (2005) (quoting Commonwealth v. White, 415 A.2d 399, 400 (1980)).  A criminal defendant must, therefore, "establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial."  Id. (citing Commonwealth v. Carter, 466 A.2d 1328, 1332–33 (1983)).

Commonwealth v. Hairston, 84 A.3d 657, 668 (Pa. 2014).  "In determining whether the evidence would support a manslaughter charge, we must view the evidence in the light most favorable to the defendant."  Commonwealth v. Soltis, 687 A.2d 1139, 1141 (Pa. Super. 1996).  However, we note the "refusal to give a requested charge does not require reversal unless the

J-A28039-20

appellant was prejudiced by that refusal." Commonwealth v. Baker, 963 A.2d 495, 507 (Pa. Super. 2008) (citation omitted).

Pursuant to 18 Pa.C.S. § 2503, a person commits voluntary manslaughter if he kills another while, inter alia, "acting under a sudden and intense passion resulting from serious provocation by" the victim. 18 Pa.C.S. § 2503(a)(1). A person is guilty of involuntary manslaughter if the death of another person is the direct result of the defendant "doing . . . an unlawful act in a reckless or grossly negligent manner, or . . . doing . . . a lawful act in a reckless or grossly negligent manner[.]" 18 Pa.C.S. § 2504(a).

Here, Appellant argues a charge of voluntary manslaughter was warranted because "the facts adduced at trial court support a theory that [he] caused [Victim's] death . . . when he 'snapped out' in response to [Victim's] odd conduct in his apartment."[9] Appellant's Brief at 14. He claims that if he did attack Victim as the Commonwealth contends, "he must have been provoked" since the Commonwealth presented no evidence of motive, and he had "no other reason to hurt" Victim. Id. at 15. With regard to a charge of involuntary manslaughter, Appellant contends that his recitation of the events that night support such a charge. Indeed, he testified Victim fell down the steps twice, once "hitting her head on a brick pillar." See id. at 12-13. He claims he thought she was "just playing hurt," although Appellant

_____

[9] The record is unclear whether Appellant requested a manslaughter instruction before the jury was charged. However, he preserved this claim by objecting to the court's failure to provide such an instruction after the charge. See N.T., 7/18/19, at 213.

- 18 -

acknowledges she "would likely still be alive had [he] called 911 instead of ignoring the serious condition [she] was in." Id. at 13. Appellant also emphasizes Dr. Rentschler's testimony that, while unlikely, it was not impossible for Victim to sustain her injuries from a fall. See id. at 14. Thus, Appellant insists he is entitled to a new trial so that a jury may be charged with both voluntary and involuntary manslaughter.

The trial court determined that neither a charge on voluntary or involuntary manslaughter was warranted under the facts of this case. See Trial Ct. Op., 1/27/20, at 25-29. With regard to voluntary manslaughter, the court concluded there was no evidence Appellant "acted with 'sudden and intense passion' in causing [Victim's] fatal injury." Id. at 26. The court opined:

> Rather, [Appellant's own] testimony shows a single incident where he shoved [Victim] during an argument causing her to strike her head after which he continued to interact normally with [her]. The medical and scientific evidence was clear that this fall would not have caused [Victim']s fatal injury.

Id. at 27. Moreover, the court emphasized the "unequivocal medical testimony" that Victim "would have died immediately from [the brain stem] injury and not been able to walk and talk with [Appellant]." Id.

We note, too, that Appellant fails to point out any evidence demonstrating his purported outburst was the result of "serious provocation" from Victim. See 18 Pa.C.S. § 2503(a)(1). "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool

reflection." Commonwealth v. Montalvo, 986 A.2d 84, 100 (Pa. 2009) (citation omitted). Appellant argues only that he "must have been provoked" by the Victim to act in way that was so out of his character. See Appellant's Brief at 15 (emphasis added). Absent any evidence of serious provocation, Appellant's challenge fails.

With regard to involuntary manslaughter, the trial court similarly determined the evidence did not support a finding that Appellant "acted recklessly or with gross negligence in causing [Victim's] death." Trial Ct. Op., 1/27/20, at 28. The court opined:

> [Appellant] testified only that he pushed [Victim] causing her to fall and strike her head. The unequivocal medical evidence was that such a fall could not have caused the fatal injury. [Appellant] pushing [Victim] in response to being bitten does not reveal a conscious disregard for an unjustifiable risk of death from his action.

Id. at 28-29. Again, we find no basis to disagree.

Appellant focuses on Dr. Rentschler's acknowledgment that it was "possible" for a person to "hit their head on the corner of [a] pillar and sustain an injury similar to what [Victim] sustained[.]" Appellant's Brief at 14, citing N.T., 7/18/19 at 142. However, immediately after this questioning, the following exchange occurred during the Commonwealth's redirect examination:

> [Commonwealth:] Dr. Rentschler, let's cut to the chase. Would it be possible to sustain the basilar skull fracture that would require 1,000 pounds of pressure without having a serious indentation in the skull?
>
> [Dr. Rentschler:] No, no, it would not. In this case, it would not.

N.T., 7/18/19, at 142. Thus, while Dr. Rentschler conceded an individual could sustain a basilar skull injury from a fall, he clearly opined that a fall was not the cause of Victim's injury herein. Thus, we agree no charge of involuntary manslaughter was warranted.

Furthermore, we note that although the jury was charged on both first-degree and third-degree murder, they returned a verdict of guilty on the higher graded offense. See N.T., 7/18/19, at 204-10. Accordingly, even if the trial court erred in failing to provide a manslaughter charge, Appellant suffered no prejudice. See Baker, 963 A.2d at 507; Commonwealth v. Haynes, 577 A.2d 564, 574 (Pa. Super. 1990 (concluding appellant was not prejudiced by trial court's denial of manslaughter charge, when jury was charged on first, second and third-degree murder; "jury could have exercised its mercy dispensing power and brought in a verdict of third or second degree murder[,] but it found appellant guilty of first-degree murder). Accordingly, Appellant is entitled to no relief on this claim.

Lastly, Appellant avers the trial court erred when it failed to suppress the recorded surveillance video based upon a Brady violation. Appellant's Brief at 19-20. This claim was addressed during a pretrial suppression hearing conducted on July 5, 2019.

Our standard of review for an order denying a motion to suppress evidence is well-established:

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the

Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

Commonwealth v. Smith, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted).

In order to establish a Brady violation, a defendant must demonstrate: "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant." Commonwealth v. Koehler, 36 A.3d 121, 133 (Pa. 2012) (citation omitted).

To demonstrate prejudice, "the evidence suppressed must have been material to guilt or punishment." Evidence is material under Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the trial could have been different. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense."

Commonwealth v. Haskins, 60 A.3d 538, 547 (Pa. Super. 2012) (citations omitted and emphasis added). Moreover,

[t]here is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it. When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police." Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."

Commonwealth v. Chamberlain, 30 A.3d 381, 402 (Pa. 2011) (citations omitted and emphasis added).

Here, Appellant contends the trial court should have suppressed the surveillance video from the Elks Lodge because it was missing 42 seconds "of the 149 seconds of video depicting the interaction between [Appellant] and [Victim]."[10] See Appellant's Brief at 17, 20. He claims the "un-altered video was in the possession of the police [but] was irretrievable corrupted as a result of [their] actions." Id. at 17. Appellant maintains Detective Sergeant Adams, who recorded the video, should have checked the flash drive recording before deleting the recording on his cell phone. Id. at 18. Further, he insists the missing video "is a violation of the Brady rule because the video would have been exculpatory at trial and would have been available to impeach prosecution witnesses." Id. at 20. Specifically, Appellant maintains that the missing video would have provided the jury "a basis on which to believe [his] version of the incident[,]" and "would potentially have provided material to impeach the testimony of Dr. [ ] Whaley [that Victim] would have been 'instantaneously incapacitated' by a basilar skull fracture." Id. Thus, he

_____

[10] It merits mention that the missing 42 seconds of video are not continuous. Appellant explains the relevant video was split into four segments: (1) 6:28:39 a.m. to 6:29:55 a.m.; (2) 6:30:03 a.m. to 6:30:21 a.m.; (3) 6:30:37 a.m. to 6:31:31 a.m.; and (4) 6:31:49 a.m. to 6:32:04 a.m. See Appellant's Brief at 17. Thus, "[t]he missing portions include eight seconds between the first and second video, sixteen seconds between the second and third video, and eighteen seconds between the third and fourth video." Id.

argues "the Commonwealth's use of the altered video resulted in extreme prejudice against [him]." Id. at 21.

First, we conclude Appellant cannot establish the deletion of the cell phone video constituted a Brady violation. As noted supra, in order to establish a Brady violation, Appellant must demonstrate the missing video was material to his guilt or innocence. See Haskins, 60 A.3d at 547. Here, Appellant can only engage in speculation as to what could have been observed on the missing 42 seconds of video. See Trial Ct. Op., 7/11/19, at 8 (Appellant "failed to established that the missing video is materially exculpatory[;] instead he has only established that the missing video segments might be potentially useful by showing speculative events that may have occurred during the missing time"). Thus, Appellant's Brady claim fails.

Moreover, we conclude Appellant cannot demonstrate he is entitled to relief under the "potentially useful" evidence test. See Chamberlain, 30 A.3d at 402. In its opinion denying Appellant's motion to suppress, the trial court explained that because the missing video was "merely potentially useful," Appellant was required to "establish that the loss of the video segments was a result of bad faith on the part of the Commonwealth." Trial Ct. Op., 7/11/19, at 9 (emphasis added). In concluding Appellant failed to do so, the trial court opined:

> The evidence of record shows that [Detective Sergeant] Adams: viewed the video on November 5[, 2017]; recorded a portion of it on his cell phone using its video camera; and downloaded the video on November 6th using the recording devices built-in software. Further, [Detective Sergeant] Adams testified that he

had used similar systems before to download the video and that gaps in the video appeared once downloaded. Viewed in its totality the evidence does not show that [Detective Sergeant] Adams acted to circumvent discovery or in bad faith in downloading the surveillance video in the method he did. Indeed, [Appellant's] counsel acknowledged at the July 5[, 2019,] hearing that "at this time . . . we haven't shown that there was any bad faith on the part of the police department." N.T. 7/5/19 p. 8.

Trial Ct. Op., 7/11/19, at 9-10. Because the record supports the court's findings, and Appellant's appellate brief fails to identify any bad faith on the part of the Commonwealth, we conclude no relief is warranted. See Chamberlain, 30 A.3d at 402.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/06/2020